POCONO MOUNTAIN SCHOOL DIS-
TRICT and Inservco Insurance
Services, Petitioners

v.

WORKERS' COMPENSATION AP-
PEAL BOARD (EASTER-
LING), Respondent

Rick Easterling, Petitioner

v.

Workers' Compensation Appeal Board
(Pocono Mountain School
District), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 3, 2014.

Decided April 10, 2015.

Janet Jackson, Stroudsburg, for petitioner.

Ellen J. Kaska, Allentown, for respondents.

BEFORE: DAN PELLEGRINI, President Judge, and MARY HANNAH LEAVITT, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge ANNE E. COVEY.

Pocono Mountain School District and Inservco Insurance Services (collectively, Employer) petition this Court to review the Workers' Compensation Appeal Board's (Board) March 21, 2014 order (Board's order) affirming the Workers' Compensation Judge's (WCJ) decision granting in part Rick Easterling's (Claimant) petition to review compensation benefits (Review Petition) relative to the specific loss of his left hand. Claimant also petitions this Court to review the Board's order reversing the WCJ's dismissal of Employer's petition for modification of compensation benefits (Modification Petition), thus granting Employer an offset for Claimant's Social Security (old age) bene-

fits.[1] Essentially, there are two issues before this Court: (1) whether the Board erred by affirming the WCJ's determination that Claimant sustained a specific loss of his left hand; and, (2) whether the Board erred by reversing the WCJ's conclusion that Employer is not entitled to a Social Security benefit offset. Upon review, we affirm in part and reverse in part.

Claimant suffered a work-related injury on January 20, 2010 when he slipped and fell on ice, and struck his head, left shoulder and arm at work. Employer issued a notice of temporary compensation payable (NTCP), and began paying Claimant total disability benefits. The NTCP was converted to a notice of compensation payable (NCP) on April 24, 2010. Claimant filed a Review Petition to amend the NCP to include complex regional pain syndrome (CRPS) of the upper left extremity, left upper extremity cubital tunnel syndrome and loss of use of his left hand.[2] Employer denied the allegations in the Review Petition. At a May 12, 2011 hearing, Claimant amended his Review Petition to include a head injury. The parties stipulated that Claimant's work injury included CRPS of the upper left extremity and status post left ulnar nerve release, but Employer denied Claimant's petition for a head injury and continued to deny his specific loss claim.

Claimant was 62 years old on the day of his injury. In February 2010, Claimant began receiving Social Security retirement benefits. On June 23, 2011, Employer filed the Modification Petition claiming an offset and credit for the Social Security retirement benefits Claimant received. Claimant filed an answer denying that Employer was entitled to an offset. Additional hearings were held on July 27, 2011 and November 9, 2011.

■ By September 7, 2012 decision, the WCJ denied the Review Petition as to Claimant's alleged head injury, but granted it relative to the specific loss of Claimant's left hand. The WCJ also denied and dismissed Employer's Modification Petition, concluding that Employer failed to meet its burden of proving its entitlement to credit for Claimant's receipt of Social Security benefits. Employer appealed to the Board. By March 21, 2014 opinion and order, the Board reversed the WCJ's denial of Employer's Modification Petition, but affirmed the WCJ's decision in all other respects. Employer and Claimant filed cross-appeals with this Court.[3]

■ Employer argues on appeal that the Board erred by affirming the WCJ's determination that Claimant suffered a specific loss of his left hand because it is not supported by substantial evidence. Specifically, Employer claims that the medical expert on whose testimony the WCJ relied stated that Claimant lost the use of his "left upper extremity" for which

---

1. Section 123.2 of the Board's Regulations define "Social security (old age) benefits" as "[b]enefits received by an employee under the Social Security Act (42 U.S.C.[] §§ 301–1397(e)) relating to Social Security retirement income." 34 Pa.Code § 123.2.

2. The NTCP limited Claimant's injury to left shoulder and lumbosacral spine sprains.

3. "Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated." *Dep't of Transp. v. Workers' Comp. Appeal Bd. (Clippinger)*, 38 A.3d 1037, 1042 n. 3 (Pa.Cmwlth. 2011).

By April 30, 2014 order, this Court consolidated Employer's and Claimant's cross-appeals, and designated Claimant as petitioner. Employer filed an application for supersedeas, which this Court denied by June 9, 2014 order on the basis that Employer did not make a strong showing that it was likely to prevail on the merits.

there is no specific loss provided in the Workers' Compensation Act (Act),[4] that there is no competent medical evidence that Claimant's left hand condition is permanent, and that Claimant's left hand injury was not separate such that he is entitled to both specific loss and total disability benefits. Claimant, however, maintains that the WCJ's finding that Claimant suffered a specific loss of his left hand is well supported by the record.

Under Section 413(a) of the [Act], 77 P.S. § 771, the WCJ may amend the NCP at any time during litigation of any petition if the evidence shows that the injury sustained in the original work incident is different or more expansive than that listed in the NCP. This is known as a 'corrective amendment.' In addition, the NCP can be amended if the claimant files a review petition and proves that another injury subsequently arose as a consequence of the original injury. The party seeking to amend the NCP has the burden of proving that the NCP is materially incorrect.

*Harrison v. Workers' Comp. Appeal Bd. (Auto Truck Transp. Corp.),* 78 A.3d 699, 703 (Pa.Cmwlth.2013) (citations and footnote omitted). Here, the NTCP acknowledged that Claimant sustained "left shoulder [and] lumbosacral spine sprains" as a result of his January 20, 2010 fall. Reproduced Record (R.R.) at 1a. Claimant's Review Petition sought to amend that injury description to include, *inter alia,* "loss of use of the left hand." R.R. at 4a. The WCJ concluded that, based upon the credible evidence offered by orthopedic surgeon Frederick J. Barnes, M.D. (Dr. Barnes),

Claimant sustained a specific loss separate and apart from his other work injuries and, thus, Claimant is entitled to 335 weeks of specific loss benefits once his total disability benefits end.[5]

Section 306(c) of the Act authorizes the WCJ to award 335 weeks of benefits for specific loss of a hand. 77 P.S. § 513(1). "A specific loss is either (1) the loss of a body part by amputation or (2) **the permanent loss of use of an injured body part for all practical intents and purposes.**" *Schemmer v. Workers' Comp. Appeal Bd. (U.S. Steel),* 833 A.2d 276, 279 n. 5 (Pa.Cmwlth.2003) (emphasis added).

When a claimant alleges that his injury has resolved into a specific loss, he has the burden of proving that he has permanently lost the use of his injured body part for all practical intents and purposes. A specific loss requires more than just limitations upon an injured worker's occupational activities; **a loss of use for all practical intents and purposes requires a more crippling injury than one that results in a loss of use for occupational purposes. However, it is not necessary that the injured body part be one hundred percent useless** in order for the loss of use to qualify as being for all practical intents and purposes. Whether a claimant has lost the use of a body part, and the extent of that loss of use, is a question of fact for the WCJ. Whether the loss is for all practical intents and purposes is a question of law.

*Miller v. Workers' Comp. Appeal Bd. (Wal–Mart),* 44 A.3d 726, 728 (Pa.Cmwlth.

---

4. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.1, 2501–2708.

5. Based upon the WCJ's findings and specific references to 335 weeks for specific loss under Section 306(c) of the Act, it appears that the WCJ's conclusion that "Claimant is enti-

tled to 335 weeks of **total disability** ... once his total disability ends" was a misprint and, in accordance with his earlier statements, what he meant was that "Claimant is entitled to 335 weeks of **specific loss benefits** ... once his total disability ends."

2012) (emphasis added) (quoting *Jacobi v. Workers' Comp. Appeal Bd. (Wawa, Inc.),* 942 A.2d 263, 267–68 (Pa.Cmwlth.2008) (citations omitted)).

It is well established that in matters involving specific loss claims, a claimant who sustains an injury that is compensable under Section 306(c) of the Act, 77 P.S. § 513 (relative to specific loss calculations), is not entitled to compensation beyond that specified in that section even though he may be totally disabled by the injury. The exception to this rule, found in Section 306(d), 77 P.S. § 513, is when a claimant may receive benefits for injuries which are separate and distinct from those which normally flow from the specific loss injury. The Supreme Court in *Killian v. Heintz Div. Kelsey Hayes,* [468 Pa. 200], 360 A.2d 620 (1976), set the standard for this determination in stating:

> [W]here it is claimed that some other part of the body is affected, it must definitely and positively appear that it is so affected, as a direct result of the permanent injury; the causal connection must be complete, and, further the disability must be **separate and distinct from that which normally follows an injury under [Section 306(d)]**, and must endure beyond the time therein mentioned. There must be a destruction, derangement or deficiency in the organs of the other parts of the body.

*Killian,* 360 A.2d at 624 (quoting *Lente v. Luci,* [275 Pa. 217], 119 A. 132, 133 (1922)) (emphasis added). While injuries that flow from the specific loss injury are considered compensated under specific loss benefits, injuries that are separate and distinct from the specific loss injury are eligible for their own benefits.

*Sharon Steel Corp. v. Workers' Comp. Appeal Bd. (Frantz),* 790 A.2d 1084, 1088 (Pa.Cmwlth.2002) (citations and footnote omitted).[6] Thus, "Section 306(d) of the Act permits a claimant to prove that he sustained either disability or specific loss for each separate injury, provided that payment of specific loss benefits is withheld until after all disability benefits are terminated. 77 P.S. § 513." *Crews v. Workers' Comp. Appeal Bd. (Ripkin),* 767 A.2d 626, 632 (Pa.Cmwlth.2001).

Claimant testified at the November 9, 2011 hearing that, after his January 20, 2010 fall, he was taken by ambulance to Pocono Medical Center, where he underwent a CAT scan, was treated and released. He began treating with Dr. Barnes on January 22, 2010.

Claimant explained that he has held his left arm at chest level at all times since February 2010 because extending it downward causes pain and shaking. He described for the record that his fingers have been "all crunched up" in a fist, and he cannot spread them apart from one another. R.R. at 55a. Claimant stated that

---

**6.** This Court explained the distinction between disability and specific loss benefits:
[S]ections 306(a) and (b) [of the Act] ... compensate a claimant for the loss of earning power, and [S]ection 306(c) [of the Act] ... provides for compensation regardless of whether the injury has any effect on a claimant's earning capacity.... The underlying rationale in these cases is that, under workers' compensation law, the term 'disability' is synonymous with loss of earning power; because a claimant's injury may not cause more than a total loss of a claimant's earning power, a claimant may not be more than totally disabled.
However, it is well settled that specific loss benefits are payable without regard to a claimant's earning capacity.
*Faulkner Cadillac v. Workers' Comp. Appeal Bd. (Tinari),* 831 A.2d 1248, 1252–53 (Pa. Cmwlth.2003) (citations omitted).

although he can wiggle his thumb, it otherwise pulls itself back into the fist. Claimant declared that other than putting something between his chest and upper arm to hold it against his body, he "cannot use [his left arm] at all." R.R. at 57a. He testified that he uses his right hand to dress, and that he was required to buy shoes without laces because he could no longer tie them. Although he can put his pants on, Claimant needs assistance buttoning them, and has difficulty shaving with just his right hand. He does not cook or do yard or house work, and drives using only his right hand. Claimant reported that he has not worked since January 20, 2010, nor has he looked for work, since he could only do a right-handed job.

Claimant stated that he has been using a spinal cord stimulator since April 2010, which reduces his pain level from a constant 10 to a daily range of 4 to 7. In May 2010, Claimant had decreased swelling and early finger movement. Claimant underwent nerve surgery in June 2010. Thereafter, he attended physical therapy until August 2010. Claimant admitted that once during a physical therapy session, he was able to pick up a Splenda packet with his left hand. He stated at the hearing, however, that he can no longer pick up anything with his left hand. At the time of the November 2011 hearing, Claimant used only the stimulator and was not taking any medications. Claimant does not do any exercises for his hand.

Claimant also presented Dr. Barnes' testimony, who treated Claimant from January 22, 2010 through November 16, 2011, and witnessed Claimant's left hand function decline. According to Dr. Barnes, although Claimant complained of left shoulder pain with movement as of January 22, 2010, Claimant had no neck pain or hand numbness. Dr. Barnes prescribed anti-inflammatory and pain medication, instructed Claimant to ice his shoulder, and recommended a left shoulder MRI to rule out labrum and rotator cuff tears. Dr. Barnes "temporarily disabled [Claimant] from his job...." R.R. at 79a.

Dr. Barnes testified that as of January 29, 2010 Claimant complained of numbness and tingling down his left arm into his thumb and index finger. He noted that Claimant's left shoulder MRI was negative for tears or fractures. Dr. Barnes diagnosed Claimant with a left shoulder bruise and, in light of his changes, referred Claimant to a neurologist. Dr. Barnes continued to keep Claimant out of work.

Dr. Barnes described that on February 17, 2010, Claimant had increased pain and numbness down his left arm extending from his neck to his hand, increased left hand swelling, and he was beginning to have difficulty flexing and extending his fingers. He recalled that Claimant described sweating more on his left side than his right, and that the color of his left hand changed with the temperature. Dr. Barnes related that a neurologist performed EMG studies and diagnosed Claimant with carpal tunnel syndrome, entrapment of the ulnar nerve at the elbow and brachial plexus syndrome, and prescribed sympathetic nerve blocks.

As of Claimant's February 24, 2010 visit, Dr. Barnes found that Claimant experienced good temporary relief with his first block. Ultimately, Dr. Barnes explained that Claimant had only temporary relief after five nerve block procedures. Dr. Barnes opined that Claimant had CRPS. Because he was concerned that Claimant's condition was getting progressively worse, he referred Claimant to the Philadelphia Hand Center for care.

According to Claimant, he saw Randall Culp, M.D. (Dr. Culp) at the Philadelphia Hand Center beginning in March 2010. Claimant explained that although Dr. Culp

discussed the possibility of implanting a stimulator, it was not done. Rather, Claimant recalled that Dr. Culp treated him with nerve blocks, after which he could open his fingers for several hours, but the improvement did not last.

Dr. Barnes reported improved shoulder and finger flexion and extension at Claimant's March 3, 2010 examination due to therapy, however, Claimant could not flex or extend his left arm normally. As of March 17, 2010, Claimant had full left shoulder range of motion, but difficulty opening his fingers. At Claimant's March 31, 2010 appointment, he had full left elbow range of motion, but Dr. Barnes found that Claimant's left hand was swollen and dysesthetic, and he was unable to extend his fingers. Although Dr. Barnes expressed that Claimant exhibited less hand swelling, slight finger movement and he could minimally unclench his fist on May 12, 2010, as of June 9, 2010, Claimant again had minimal movement in his fingers.

Dr. Barnes described that a bone scan ordered by Dr. Culp supported a CRPS diagnosis. He explained that because Dr. Culp thought Claimant was developing a claw hand deformity, he performed an ulnar nerve release and manipulation of Claimant's fingers on June 17, 2010. Thereafter, when Claimant treated with Dr. Barnes on July 2, 2010, he had decreased range of motion in his left hand and aching in his left shoulder. Dr. Barnes recommended that Claimant continue occupational therapy. Claimant treated with Dr. Barnes again on August 20, 2010. At that appointment, Claimant had decreased range of motion, his hand remained in a flexed (fist) position, and his skin was atrophic. Dr. Barnes recorded that Claimant had left upper extremity dysfunction, that he was disabled from his occupation, and that he should get a steer-ing wheel knob so that he could drive using only his right hand. Dr. Barnes noted that, according to Dr. Culp's final record on November 9, 2010, Claimant had not improved. Dr. Barnes confirmed that Dr. Culp had recommended that Claimant get a permanent, implantable electrical stimulator for his left arm.

As of the last time Dr. Barnes saw Claimant on November 16, 2011, his hand was clenched, his skin was thin, shiny and hypersensitive to fine touch, and he had decreased range of motion in his left shoulder and elbow. Dr. Barnes could not pull Claimant's fingers out. He diagnosed Claimant with CRPS and left shoulder pain, and warned Claimant of the infection potential due to increased difficulty cleaning his hand, which could lead to amputation. Dr. Barnes opined within a reasonable degree of medical certainty:

> [H]is left hand is functionless as far as I'm concerned. His left elbow doesn't have a functional range of motion.... [H]e's got a stiff shoulder that goes along with the [CRPS]. And I explained to him that the fact that he wasn't using his hand makes it harder for every other joint to work appropriately because if you don't use your arm, shoulders will get stiff. As so[,] for the most part, to me, I thought his left upper extremity was not functional.

R.R. at 87a. He declared that Claimant could not use his left hand to pick an item up from a table, to use a knife or fork, or to press a common button (although he could press a large handicap door button), and he has difficulty dressing. He can hold items under his arm because his arm stays close to his chest. When asked: "Is there anything at all ... other than what I have described that he described, that you think he could do with that left arm?", Dr. Barnes replied: "No." R.R. at 89a. Dr. Barnes explained that in his November 16,

2011 report, he opined that Claimant's left hand is useless, but during his deposition he referred to Claimant's left upper extremity: "I really don't think I changed my opinion. I think he's disabled and I don't think he can use his left arm for anything that I can think of." R.R. at 100a. He agreed, however, with Dr. Culp's opinion that Claimant could return to a job in which he only used his right hand. Dr. Barnes had no expectation that Claimant's left upper extremity would improve.

Employer presented the testimony of orthopedic surgeon David J. Bozentka, M.D. (Dr. Bozentka). Dr. Bozentka examined Claimant on November 9, 2010 and again on June 14, 2011. He reviewed Claimant's medical records, took his history and conducted a physical examination. On November 9, 2010, one year prior to Claimant's last visit with Dr. Barnes, Dr. Bozentka observed that Claimant demonstrated some left forearm atrophy, and that he could lift his left arm to 90 degrees and internally rotate it. Dr. Bozentka noted Claimant's dystrophic changes, shiny skin and sweating in his left hand, some swelling in his hand and knuckle joints, and "very, very limited finger range" of motion. R.R. at 129a. He concluded that Claimant had CRPS and contractures of his left upper extremity. He declared that although Claimant was not fully recovered from his injury, he had reached maximum medical improvement. He testified that although Claimant could use his forearm and arm to some degree, Claimant had permanent limitations because of the contracture of his fingers, and there were certain elements of his job he could not perform. Dr. Bozentka completed an Employee Physical Capability Form, in which he stated that Claimant was limited to carrying up to 20 pounds, and that he could not push, pull or do fine manipulations with his left hand, but could use his left upper extremity in an assistive capacity. See Certified Record (C.R.) Notes of Dr. Bozentka Testimony, Ex 2.

At his June 14, 2011 evaluation, Dr. Bozentka updated Claimant's history, during which Claimant mentioned experiencing pain in his left shoulder, elbow, wrist and hand, which varied in severity depending upon his activity level, but he had not taken pain medication in several weeks. Dr. Bozentka recalled Claimant describing that he was able to hold bottles under his arm. Dr. Bozentka testified that his examination confirmed the same, except that Claimant experienced tremors when he lifted his shoulder up, and he exhibited less dystrophic change. Dr. Bozentka concluded within a reasonable degree of medical certainty that Claimant had reached maximum medical improvement, and that no further surgery or therapy are required. He again expressed that Claimant was capable of gainful employment, using his left elbow and shoulder in an assistive capacity, and that his main limitation is in his left hand, which he could use for only gross motor skills (*i.e.*, his knuckle or the tip of his thumb). Dr. Bozentka stated that such restrictions are permanent. He completed an updated Employee Physical Capability Form which did not change in any material capacity from the prior evaluation. See C.R. Notes of Dr. Bozentka Testimony, Ex. 3. Dr. Bozentka concluded:

Q. He can't use his left hand as a normal individual can use his left hand, correct?

A. No.

Q. And for all practical intents and purposes, he doesn't have the use of his hand on the left side?

A. ... [H]e could use it in an assistive capacity. So he does have some function. It would be better than a prosthesis per se.

R.R. at 151a. Dr. Bozentka agreed that picking up a pencil from a desk with his left hand would be difficult and, without some adaptive device, he would not be able to use a fork, knife or toothbrush with that hand.

■■■ The law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n. 8 (Pa. Cmwlth.2011). "The WCJ ... is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa.Cmwlth.2000).

■■■ Here, the WCJ deemed Claimant's testimony credible, and found Dr. Barnes' testimony more credible than Dr. Bozentka's to the extent their testimony conflicted, particularly relative to Claimant's ability to use his left hand. The WCJ concluded:

> Given the parties['] acknowledgement that Claimant sustained left shoulder and lumbosacral spine sprains as well as [CRPS] of the left upper extremity and status post left ulnar nerve release, ... Claimant met his burden [of proving] that he sustained a separate and apart injur[y] in the nature of a specific loss of his left hand for all practical intents and purposes.

WCJ Dec. at 6. In reviewing an evidentiary record on appeal, the courts have consistently ruled that

> the WCJ's findings must ... be supported by substantial evidence of record. Substantial evidence is relevant evidence that a 'reasonable person might accept as adequate to support a conclusion.' In reviewing a decision for substantial evidence, the court must view the evidence in the light most favorable to the party

who prevailed before the WCJ and draw all reasonable inferences from the evidence in favor of the prevailing party.

*Wieczorkowski v. Workers' Comp. Appeal Bd. (LTV Steel)*, 871 A.2d 884, 890 (Pa. Cmwlth.2005) (citation omitted). This Court has stated: "[I]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd)*, 933 A.2d 1095, 1101 (Pa.Cmwlth.2007) (quoting *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa.Cmwlth. 2005)). Thus, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. Unless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal." *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa.Cmwlth.2006) (citation omitted).

The Board in this case reviewed the record evidence and, finding that there was substantial credible evidence to support it, affirmed the WCJ's decision as to Claimant's specific loss claim. After review, we likewise hold that there was substantial credible evidence to support the WCJ's findings.

Employer claims that Dr. Barnes' general references to Claimant's "left upper extremity" rather than specifically to Claimant's left hand means that "there is no medical testimony that Claimant has lost the use of his left hand for all practical intents and purposes." Employer Br. at 20–22; *see* R.R. at 86a. However, Dr. Barnes specifically testified that Claimant's "hand ... was nonfunctional." R.R. at 86a. He also expressly declared that

for all intents and purposes, Claimant's "left hand is functionless...." R.R. at 87a. During Dr. Barnes' cross-examination, Employer's counsel acknowledged that the November 16, 2011 report reflects Dr. Barnes' opinion that Claimant's left hand is useless. *See* R.R. at 100a. Although Employer claims that the WCJ "did not render any finding or conclusion that Claimant's left hand condition is permanent" (Employer Br. at 19), the WCJ's decision contains the specific finding, without limitation, that "Claimant has los[t] the use of his hand...." WCJ Decision at 6. Further, Dr. Barnes clarified that his differing references did not represent a change in his opinion, but both support his opinion that Claimant is "disabled and I don't think he can use his left arm for anything...." R.R. at 100a. In Finding of Fact 16, the WCJ stated: "Dr. Barnes opined that Claimant had lost function of his left upper extremity." WCJ Decision at 2. In Finding of Fact 17, the WCJ notes that "Dr. Barnes opined to a reasonable degree of medical certainty that Claimant los[t] use of his left hand for all practical intents and purposes." WCJ Decision at 2. Thus, Employer's claim of error related to Dr. Barnes' reference during his deposition to Claimant's "left upper extremity" is without merit.

Employer's contention that there is no competent medical evidence that Claimant's left hand condition is permanent is also without merit. Dr. Barnes testified that there is medically nothing more that could improve Claimant's disabling condition, including changing the battery in his current spinal stimulator or implanting spinal stimulator for permanent blocking, since there is scarring and fibrosis in his hand, and the stimulator lessens pain rather than increases function. *See* R.R. at 87a, 95a–96a, 98a–99a, 107a–108a. He fur-

ther indicated that amputation surgery may change Claimant's condition, but not his function, and may even create new problems. *See* R.R. at 110a–111a. Dr. Barnes concluded that he does not think that Claimant will have any improvement. *See* R.R. at 112a. The WCJ deemed Dr. Bozentka's testimony credible to the extent that it did not conflict with Dr. Barnes' opinions. WCJ Decision at 4. Like Dr. Barnes, Dr. Bozentka concluded that as of November 2010 Claimant had not fully recovered from his work injury, and he had reached maximum medical improvement. *See* R.R. at 130a. Following Claimant's June 2011 examination, Dr. Bozentka reiterated that Claimant had reached maximum medical improvement, and that neither therapy nor surgery were in order. Dr. Bozentka even specifically concluded that "[Claimant] did have limited function of the left upper extremity. I believe that his **restrictions are permanent.**" R.R. at 136a–137a (emphasis added). Accordingly, Employer's claim that there is no competent medical evidence that Claimant's left hand condition is permanent is not supported by the record evidence.

▮▮▮▮▮ Employer next asserts that Claimant's left hand injury was not separate such that he is entitled to both specific loss and total disability benefits. Rather than requiring separate and distinct injuries from a single incident, in order to receive both total disability and specific loss benefits, a claimant need only have suffered separate and distinct disabilities. *BCNR Min. Corp. v. Workmen's Comp. Appeal Bd. (Hileman)*, 142 Pa.Cmwlth. 588, 597 A.2d 1268 (1991). We acknowledge that if a claimant cannot satisfy his burden of proving that he has a disability separate and distinct from his specific loss,

he is only entitled to specific loss benefits.[7] *Richardson v. Workers' Comp. Appeal Bd. (Am. Surfpak)*, 703 A.2d 1069 (Pa.Cmwlth. 1997).

The record evidence in the instant case is clear that Claimant has permanently lost the use of his left hand and is entitled to specific loss benefits. Employer stipulated that Claimant's work injuries include CRPS of the left upper extremity and status post left ulnar release for which he is entitled to total disability benefits. However, in February 2010, after Claimant experienced increased sweating and pain, and numbness in his left arm from the neck into his hand, with increased swelling in his hand making it difficult to flex and extend his fingers, Dr. Barnes diagnosed Claimant with CRPS of the left upper extremity. *See* R.R. at 80a–81a. Left upper extremity is defined as "one of the ends of an elongated or pointed structure. Incorrectly used to mean limb." *Stedman's Medical Dictionary* 635 (27th ed. 2000). "Hand" is defined as "the portion of the upper limb distal to the radiocarpal joint, comprising the wrist, palm, and fingers." *Id.* at 785. The Pennsylvania Superior Court has declared that the term "hand" referenced in Section 306 of the Act "means the arm up to, but not including, the elbow. If claimant has lost the use of his elbow or upper arm, he has lost the use of his 'arm,' within the meaning of the Act. If he hasn't, he has not lost use of his arm." *Gondak v. Wilson Gas Coal Co.*, 148 Pa.Super. 566, 25 A.2d 854, 855 (1942).

Dr. Culp and Dr. Bozentka confirmed Dr. Barnes' CRPS diagnosis. *See* R.R. at 83a, 130a. Dr. Barnes stated that the CRPS caused Claimant's shoulder to stiffen. *See* R.R. at 87a. Based upon the credible medical evidence, what began as a shoulder contusion resulted in CRPS, which caused Claimant's shoulder to stiffen, which led to progressively decreased left shoulder and elbow range of motion and, due to lack of use, caused Claimant's hand to become progressively atrophied and sensitive and, ultimately, dysfunctional. The record evidence supports that but for Claimant's loss of use of his left hand, he would still be disabled by CRPS of his left upper extremity. Employer provided no evidence to the contrary. In light of the evidence that Claimant suffered a destruction, derangement or deficiency of a part of his body other than his left hand, Employer's contention that Claimant is not entitled to both specific loss and total disability benefits fails.

Because the WCJ's credibility determinations were clearly supported by the record, we may not disturb them. Moreover, since there was substantial evidence to support the WCJ's conclusion that Claimant suffered specific loss of his left hand separate and apart from his accepted work injuries, we hold that the WCJ did not err in granting Claimant's Review Petition and amending Claimant's work injuries to include a specific loss of his left hand. Thus, the Board properly affirmed the WCJ's decision on this issue.

Claimant argues on appeal that the Board erred by reversing the WCJ's conclusion that Employer is not entitled to a credit and/or offset for Claimant's Social Security benefits because although the benefits were received after his work injury, they were approved before his injury date. Employer, however, contends that its offset entitlement stems from the fact

---

**7.** If there is no disability separate and apart from the specific loss, disability payments previously received will be credited to the employer regardless of when the injury resolved in a specific loss. *Allegheny Ludlum Steel Corp. v. Workers' Comp. Appeal Bd. (Malobicky)*, 753 A.2d 330 (Pa.Cmwlth.2000).

that no benefit was due and no payment was made prior to Claimant's work injury.

Section 204(a) of the Act, 77 P.S. § 71(a), permits an employer or its insurer to take a credit against workers' compensation disability benefits ... including Social Security retirement benefits. The legislature has made the policy decision that because the employer helps to fund Social Security, it should receive a credit towards workers' compensation disability.

*Caputo v. Workers' Comp. Appeal Bd. (Commonwealth)*, 34 A.3d 908, 912 (Pa. Cmwlth.2012). Section 123.7 of the Board's Regulations provides, in relevant part:

> (a) Workers' compensation benefits otherwise payable shall be offset by 50% of the net amount received in Social Security (old age) benefits. The offset shall only apply to amounts which an employe receives subsequent to the work-related injury. The offset may not apply to Social Security (old age) benefits which commenced prior to the work-related injury and which the employe continues to receive subsequent to the work-related injury.
> (b) The offset may not apply to benefits to which an employe may be entitled, but is not receiving.

34 Pa.Code § 123.7.

> Thus, a retired worker who has already begun collecting Social Security retirement benefits can continue to work knowing that if he subsequently sustains a compensable work injury[,] his disability benefit will be unaffected by his Social Security income, which could be substantial if the employee is like most individuals age 62 or over who have contributed to the Social Security fund for decades.

*Caputo*, 34 A.3d at 918. Accordingly, Employer is entitled to an offset if Claimant sustained his work injury before he was entitled to Social Security retirement benefits.

■ Here, the record evidence reflects that Claimant applied for Social Security retirement benefits in 2009, which was before he turned 62–years–old. By November 29, 2009 Notice of Award, the Social Security Administration (SSA) approved Claimant's application, stating: "Your **entitlement date is January 2010**," and that his payments would be based upon his current monthly benefit rate of $1,135.70. R.R. at 40a (emphasis added). However, the Notice of Award explained:

> You estimated that you would earn $[ ]15,000.00 in 2010.

> You also said that you would not earn more than $[ ]1,180.00 per month and not be active in self-employment in June through August 2010.

> **We are withholding $1,135.00 of your benefits for January 2010 because of your work and earnings.**

> When you applied for benefits, you asked that they start in the earliest possible month based on your work. We will need to know how much you will actually earn in 2010 before we can decide if January 2010 is the earliest possible month.

> For this reason, **we will contact you after you report your earnings for the year. We will let you know if your first month of entitlement to benefits will be changed.**

> The monthly earnings test applies only to 1 year. That year is the first year a beneficiary has a non-work month after entitlement to Social Security benefits. Our records show that you had or will have at least one non-work month in 2010. Therefore, we will pay you bene-

fits for years after 2010 based on the total amount you earn each year.

R.R. at 40a (emphasis added).

Claimant testified that he submitted his 2010 earnings to SSA as instructed. *See* R.R. at 68a. He reported that SSA did not thereafter contact him or send him a re-evaluation letter. Rather, on February 10, 2010, SSA issued his first monthly payment in the amount of $1,135.00. *See* R.R. at 61a; *see also* C.R. Ex. D–3 at 3 (SSA Benefit Payment History). According to SSA's Benefit Payment History, Claimant was not paid for January 2010. Claimant's 2010 benefit total was $12,485.00, which represents a $1,135.00 payment for each month of 2010, except January 2010. *See* C.R. Ex. D–3 at 3, 5.

This Court analyzed entitlement versus actual receipt of Social Security retirement benefits in *Pittsburgh Board of Education v. Workers' Compensation Appeal Board (Davis)*, 878 A.2d 173 (Pa.Cmwlth.2005), holding:

> Pursuant to Section 402(a) of the Social Security Act, [42 U.S.C. § 402(a),] it is clear that **one becomes entitled to social security old age benefits *upon application for those benefits after attaining retirement age.*** Thus, in this case Claimant became entitled to his social security benefits when he applied for those benefits in January 2000 rather than the date he actually began receiving payment of those benefits in May of 2000. Because Claimant was

entitled to benefits in January of 2000, he 'received' those benefits prior to his work-related injury in March of 2000. Therefore, for the reasons set forth above, Claimant is not subject to the Section 204(a) offset.

*Id.* at ·176 (double emphasis added). According to SSA's Regulations, "[a]pply means to **sign a form** or statement that [SSA] **accepts** as an application for benefits. . . ." 20 C.F.R. § 404.303 (emphasis added). SSA publicizes that application can be made "when you are at least 61 years and 9 months of age," and encourages applicants to "apply three months before [they] want [their] benefits to start."[8] However, in order to be "entitled" to benefits, an individual must have "applied **and** . . . proven his or her right to benefits. . . ."[9] 20 C.F.R. § 404.303 (emphasis added). The entitlement requirements are: "(a) You are **at least 62 years old**; (b) You have enough social security earnings to be **fully insured** . . .; *and* (c) **You apply**; . . . ." 20 C.F.R. § 404.310 (emphasis added).

Here, because Claimant had applied for benefits in advance of his eligibility and had been approved, he was entitled to Social Security retirement benefits when he turned 62 on January 2,[10] 2010, which was 18 days *before* his work injury occurred. *See* R.R. at 40a. That Claimant's payments did not commence until February 10, 2010, which was 21 days *after* his work injury is irrelevant. The undisputed Notice of Award states that Claimant was

---

**8.** https://faq.ssa.gov/link/portal/34011/34019/ Article/3012/How-far-in-advance-can-I-apply-for-Social-Security-retirement-benefits.           .

**9.** "Eligible means that a person would meet all the requirements for entitlement to benefits for a period of time but has not yet applied." 20 C.F.R. § 404.303.

**10.** An individual born on the first or second day of the month can be entitled to benefits

for the month of his or her 62nd birthday. Birth on any other day of the month precludes entitlement for the month in which the birth occurred since the individual would not be age 62 for that entire month. *See* SSA Program Operations Manual System RS 00202.10 at https://secure.ssa.gov/apps10/poms.nsf/lnx/0300202010; *see also* Social Security Bulletin Vol. 62 No. 3 (1999).

entitled to benefits in January 2010. Moreover, SSA did not modify Claimant's January 2010 entitlement date after receiving his earnings report. Based upon the *Pittsburgh Board of Education* Court's holding, we similarly rule that because Claimant was entitled to his Social Security retirement benefits prior to his work-related injury, Employer is not entitled to a credit and/or offset therefor and the Board erred by reversing the WCJ decision on this issue.

Based upon the foregoing, the Board's order is affirmed in part and reversed in part.

### ORDER

AND NOW, this 10th day of April, 2015, the portion of the Workers' Compensation Appeal Board's (Board) March 21, 2014 order (Board's order) affirming the Workers' Compensation Judge's (WCJ) decision granting Rick Easterling's (Claimant) Review Petition is affirmed. That part of the Board's order reversing the WCJ's dismissal of Pocono Mountain School District's (Employer) Modification Petition is reversed, and Employer is not entitled to a credit and/or offset based upon Claimant's receipt of Social Security retirement benefits.