# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Nestle USA, Inc./Vitality,                    :
                              Petitioners     :
                                              :
              v.                              :    No. 890 C.D. 2016
                                              :    Submitted: December 16, 2016
Workers' Compensation Appeal                  :
Board (Gallen),                               :
                              Respondent      :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**              **FILED:  March 27, 2017**


Nestle USA, Inc./Vitality (Employer) petitions for review of the May 10, 2016 Order of the Workers' Compensation Appeal Board (Board), affirming a Workers' Compensation Judge's (WCJ) Decision granting the Claim Petition of Shawn Gallen (Claimant).  Employer argues that the Board erred in upholding the WCJ's Decision because it is not supported by substantial evidence, it is not reasoned within the meaning of Section 422(a) of the Workers' Compensation Act

(Act),[1] and the WCJ capriciously disregarded evidence of record. After a careful review of the record, and the WCJ's opinion, we see no error.

Claimant filed a Claim Petition on September 6, 2013 alleging that he was injured on June 27, 2013 while "working on fountain and soda drink machines w[ith] contaminated water." (R.R. at 1a.) The injury is described as Legionnaires' Disease. (Id.) Employer filed an Answer to the Claim Petition on September 30, 2013, denying Claimant's allegations and asserting that "Claimant is unable to demonstrate that a work-related exposure . . . was a substantial contributing factor to Claimant's disability." (R.R. at 6a.) The matter was assigned to a WCJ for hearing and disposition.

## I. Proceeding before WCJ

Resolving the issues raised by Employer requires a rather extensive recitation of the proceedings. In support of his Claim Petition, Claimant testified by video deposition and submitted the deposition testimonies of Lawrence R. Peck,

---

[1] Act of June 2, 1915, P.L. 736, as amended, 77 P.S. § 834. Section 422(a) provides, in pertinent part, that:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. . . . When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers' compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

Id.

D.O.; Debra Eppolito; Rose Cooper; and Christine Gallen (Claimant's spouse). In opposition to the Claim Petition, Employer submitted the deposition testimonies of H. Tim Frazer, M.S. CSP, and Richard Snepar M.D., FAC.

Claimant testified, in relevant part, as follows. Claimant worked for Employer since 1994. (R.R. at 24a-25a.) Prior to his injury, Claimant served as the lead service technician for the Burlington, New Jersey office, but most of his work was performed in Pennsylvania. (Id. at 25a.) Claimant's role was to service and repair equipment dispensing beverages at hotels, colleges, prisons, schools, retirement facilities, and other similar locations. (Id.) His work duties included driving to about three locations per day and repairing beverage machines. (Id. at 26a, 30a-31a.) Many of the beverage machines he repaired had water running through them. (Id. at 27a.) When fixing the espresso machine, in particular, the water would spray into his face and chest. (Id. at 28a.) Claimant also repaired equipment at Employer's shop in New Jersey. (Id. at 29a.) The machines he repaired at the shop were dirty and required Claimant to spray them down with water and to replace parts as necessary. (Id. at 29a-30a.)

On the night of June 25, 2013, Claimant experienced chills and thought he was getting the flu. (Id. at 33a-34a.) He went to work the next two days but felt very sick. (Id. at 34a.) Claimant called off work on June 28, 2013, and went to the hospital the following day, June 29, 2013. (Id.) Claimant fell into a coma soon after arriving at the hospital. (Id. at 35a.) While in the coma Claimant was diagnosed with Legionnaires' Disease. (Id. at 42a.) He awoke from the coma sometime in July at a different hospital. (Id. at 35a-36a.) After being treated at the hospital, Claimant was discharged and transferred to St. Mary's Hospital on August 2, 2013, where he underwent in-patient rehabilitation treatment until his

3

release on September 19, 2013. (Id. at 36a, 39a.) Since his injury, Claimant is confined to a wheelchair, and his speech has changed. (Id. at 40a-41a.) Everything in his life has changed; "[his] marriage, [his] relationship with [his five] kids, [his] job, [his] ego, everything." (Id. at 41a.) He can no longer drive and needs someone to be with him whenever he goes anywhere. (Id.)

About a month prior to June of 2013, Claimant received medical treatment for pneumonia. (Id. at 71a.) Claimant smoked a pack and a half of cigarettes daily for over 20 years prior to his injury but has since quit. (Id. at 72a, 74a.) Claimant lost considerable weight while in the hospital and had some weakness due to muscle atrophy. (Id. at 77a-78a.)

Claimant thinks that he may have contracted Legionnaires' Disease while refurbishing equipment at Employer's shop in New Jersey. (Id. at 42a.) There, beverage machines sit on a pallet for up to a month, and he was responsible for flushing the machine out with water before installing new parts. (Id. at 43a.) An electrical spike often occurs during the repair process, causing water to spray out from the machine. (Id.) He does not know anyone else at work or in his family that contracted the disease. (Id. at 44a.)

Claimant went on a fishing trip to an ocean bay in New Jersey with his colleagues the week before his injury. (Id. at 81a-82a.) He did not catch any fish and did not handle the fish caught by others. (Id. at 83a.) Claimant also went fishing in a freshwater lake sometime in 2013, but could not remember when. (Id. at 86a-87a.) Claimant has an aboveground pool at his house. (Id. at 89a.) He was starting to open it in June 2013 when he got sick, and Claimant's neighbors finished the job for him. (Id.)

Rose Cooper, Claimant's neighbor, testified by deposition that she and another neighbor, Debra Eppolito, helped Claimant finish opening his pool in July, 2013, after Claimant went into the hospital. (R.R. at 145a-46a.) Ms. Cooper and Ms. Eppolito decided to drain the pool instead of using chemicals to clean it. (Id. at 147a.) Ms. Cooper also testified that she cleaned the walls of the pool and removed stones and sticks. (Id. at 147a-48a.) Ms. Cooper testified that at no point after cleaning the pool did she or anyone in her family become ill. (Id. at 150a.) Ms. Eppolito also testified by deposition to her role in cleaning Claimant's pool that mirrored Ms. Cooper's testimony. (Id. at 178a-81a.) Ms. Eppolito further testified that neither she, nor anyone in her household, became ill after cleaning the pool. (Id. at 181a-82a.) Claimant's spouse also testified by deposition to the fact that Claimant started to open the pool and that he went on a fishing trip before he became ill. (Id. at 209a-11a.) Claimant's spouse also testified that her daughter and her daughter's boyfriend helped drain the pool and neither of them fell ill. (Id. at 212a-14a.) She further testified that Claimant is not fully independent and needs help bathing, getting drinks, preparing food, getting dressed, as well as general standby assistance. (Id. at 233a-34a.)

Dr. Peck, Claimant's family doctor, testified by deposition as follows. Dr. Peck is board certified in family practice and sees all types of patients with all types of conditions. (R.R. at 258a-60a.) In his 30 years of practice, Dr. Peck "may have had one" patient with Legionnaires' Disease years ago while in training and has treated only a couple patients with brain trauma. (Id. at 261a.) Dr. Peck first saw Claimant on September 26, 2013, where Claimant complained of a running nose and sore throat. (Id. at 262a-64a.) Claimant told Dr. Peck about his Legionnaires' Disease and the complications from his hospital stay. (Id. at 264a.)

5

Dr. Peck examined Claimant, which revealed a rapid pulse and weakness in his right upper extremity and both lower extremities. (Id. at 264a-65a.) Dr. Peck also noticed a "little bit of a facial droop on the right. His tongue was deviated to the right. He had significant trouble speaking. He also was noted to have tremors." (Id. at 265a.) Dr. Peck's diagnosis at that time was "[h]istory of Legion[n]aires['] [D]isease, anoxic brain damage complication, abnormal function of the brain and central nervous system, anxiety, dysfunctions with sleep disturbances." (Id.) With regard to Claimant's brain injury, Dr. Peck opined that all Claimant's symptoms developed after Claimant was intubated due to lack of oxygen and that "something obviously occurred in that time frame." (Id. at 267a.)

Dr. Peck reviewed Claimant's hospital records. From those records he learned that Claimant was intubated and placed on a ventilator for some time. (Id. at 270a-71a.) While in the hospital, Claimant underwent many tests and was placed on dialysis for kidney failure. (Id. at 271a.) The records further reveal that Claimant had significant trouble speaking after he was extubated. (Id. at 275a.) Claimant has slightly improved since his first visit with Dr. Peck. (Id. at 277a.) Claimant is still in a wheel chair, "[h]is speech is very slow," and he continues to suffer from significant tremors. (Id. at 277a-78a.)

Turning to Claimant's Legionnaires' Disease, Dr. Peck stated that the disease is "always associated with water, usually dirty water . . . [i]t's not contagious from person to person, but it is transmitted through water." (Id. at 268a.) Dr. Peck opined that Legionnaires' Disease typically affects people that work with HVAC or air conditioning or work around water. (Id.) After reading Claimant's testimony where Claimant detailed how water would spray his face, Dr.

6

Peck opined that this "would be a very logical way to get [Legionnaires' Disease] . . . [b]ecause [he] would breathe the droplets into [his] lungs." (Id. at 283a.)

Dr. Peck reviewed the logs from Employer showing the locations Claimant serviced beverage machines. (Id. at 278a.) While noting that the incubation period for Legionnaires' Disease is 2 to 10 days, Dr. Peck stated that it was impossible to state exactly where Claimant contracted the disease. (Id.) The following exchange then occurred between Claimant's counsel and Dr. Peck:

> Q: Have you seen any documentation to suggest that all of these places [on the travel logs] – let's just take in June of 2013, any of these places were tested for Legionella?
> A: I believe I saw maybe two places that were tested. There was a Philadelphia system and there was one other place. I believe I saw two.
> Q. Do you have an opinion where you believe [Claimant] contracted Legionella?
> A. I couldn't even guess. It could be any of th[e] places [on his travel logs].
> Q. Do you think it's related to one of these places on this list?
> A. That would be the most likely unless, I mean, it most probably came from being directly exposed to a water source that was carrying the bacteria and intimately maybe spraying in his face or being closely involved with a water source.
> Q. Doctor, can you state within a reasonable degree of medical certainty as to whether or not you believe his Legion[n]aires[' D]isease is directly attributable to his work?
> A. Within a reasonable degree of medical certainty, his Legion[n]aires[' D]isease is a direct result of his occupation.
> Q. Why do you believe that?
> A. Because this is the kind of occupation where you would be exposed to Legionella. There's no other occupation that I know of where you're exposed to that much direct water vapor from different locations and dirty machines which is typically where you find this bacteria.
> . . .
> Q. Doctor, [Claimant] testified . . . regarding an attempt to open up the pool. Do you think that he picked it up there?

7

> A. Was he opening the pool? If he was not opening the pool – had he been opening a dirty pool, had he been doing that, it would be possible but that would be also unlikely but possible.
> Q. A salt water fishing trip?
> A. No. It's not associated with salt water.

(Id. at 278a-81a.) Dr. Peck further opined that, but for Claimant's Legionnaires' Disease, Claimant would not have been intubated and, therefore, Claimant's brain injury is directly attributable to the Legionnaires. (Id. at 281a.)

Dr. Peck's current diagnosis is "[a]noxic brain injury secondary to Legion[n]aires[' D]isease." (Id. at 284a.) He expects Claimant to make minimal improvement: "the tremor is not going to go away[,]" and "[t]here's damage to the nervous system." (Id.) Claimant is on multiple medications which have not significantly improved his condition. (Id.) Dr. Peck does not anticipate Claimant returning to any form of gainful employment in the future. (Id. at 285a.)

On cross-examination, Dr. Peck recounted the history of Legionnaires' Disease and noted that the first case involved people being infected while attending a conference in Philadelphia. (Id. at 285a-86a.) These individuals did not work with water but contracted the disease from the infected HVAC system at the conference center. (Id. at 286a.) Dr. Peck admitted that "[i]n theory" someone could be infected just by being in an enclosed building with an infected HVAC system. (Id.) Dr. Peck further testified that he did not inspect the facilities in which Claimant worked and that his knowledge of Claimant's work conditions came directly from Claimant. (Id. at 287a.) When asked if his opinion that Claimant contracted the disease through the course of his employment was speculative, Dr. Peck responded:

> No. It's based on medical information and the history of how Legion[n]aires[' D]isease is contracted. It's known to be in HVAC

systems, and that is the most likely – I made it very clear within a reasonable degree of medical certainty – nothing is 100 percent. It's possible he could have gotten it somewhere else, but that's the most likely way he got it. . . .  I just think because of the large amount of places he's gone to an[d] the intimate contact that he had with [t]he water and the machines, it's much more likely that he got it that way.

(Id. at 288a-89a.)   Dr. Peck acknowledged that he has no evidence that the machines Claimant worked on contained the Legionella bacteria, does not know the specific details on how beverage machines work or are repaired, and that he did not know the exact details about Claimant opening his pool prior to contracting the disease.  (Id. at 289a-91a.)   When questioned about drawing conclusions without having the beverage machines tested, Dr. Peck stated:

> That information is not necessary, just like, for example, people get – if I have two people wrestling and they get MRSA.  I don't have to test one of them.  I know they got the MRSA from wrestling.  We make conclusions all the time without necessarily having all the information.  And I'm not saying it's 100 percent.  I'm saying that's the most likely way that he got it.  Is it possible he got it another way; it is possible he got it another way.  That's the most likely way he got it.

(Id. at 295a-96a.)   Dr. Peck further opined that the fact that other service technicians did not contract Legionnaires' Disease is not relevant as "the majority of people who are exposed to Legion[n]aires[' Disease] do not get it."  (Id. at 296a.)   Dr. Peck further opined that while it is possible that Claimant contracted Legionnaires' Disease at some location other than his work as "anything is possible[,]" it is "highly unlikely."  (Id. at 302a.)

In addition to the testimonies above, Claimant submitted a "Health Alert" published by the Pennsylvania Department of Health entitled "Increase Legionella Infections in Pennsylvania," dated July 10, 2013.  (R.R. at 481a-83a.)   The alert

9

notes "an unusual increase in reports of Legionella infections in some areas of Pennsylvania in June [of 2013]." (Id. at 481a (emphasis omitted).) The Health Alert states that the cause of the increase is unknown and that other states in the region have reported a similar increase in Legionella infections. (Id.)

Employer presented the deposition of Mr. Frazer, a certified industrial hygienist. (R.R. at 311a.) In order to determine the likelihood of Claimant's exposure to Legionella, Mr. Frazer visited Employer's facility in Burlington, New Jersey to review the facility's equipment, procedures, and work practices. (Id. at 312a.) He also reviewed the manuals of the various machines that Claimant would have installed or serviced. (Id.) According to Mr. Frazer, for Legionella to grow, it must "be in a significantly still or stagnant environment of untreated, warm water greater than about 77 degrees Fahrenheit, and the temperatures where it grows best is usually fairly elevated above that, in the 80s or 90s up to about . . . 108 degrees Fahrenheit." (Id.) Mr. Frazer opined that the temperatures of industrial beverage machines are generally in the "60s and 70s, so they're below the area where growth would be expected." (Id.) Mr. Frazer further opined that the Legionella bacteria can be transmitted only if it is in aerosolized form, such as a "fog, mist, or droplet." (Id. at 313a.) While stating that Legionella occurs everywhere, Mr. Frazer testified that "the highest potential for it to be aerosolized is usually in things like cooling towers on buildings, in water features, . . . humidifiers, air-conditioning units, shower heads, those sort of things." (Id.)

Based on his review of the machines, Mr. Frazer opined that it is unlikely that the machines would produce an aerosolized source of Legionella. (Id.) He explained that the coffee dispensing machines heat water to levels that would kill any Legionella bacteria, and that the beverage dispensers were used daily, meaning

10

that the water is not stagnant enough to produce Legionella growth, and that the water is not expelled in an aerosolized form. (Id.) With regard to Claimant's work at Employer's shop in New Jersey, Mr. Frazer opined that servicing the machines would not lead to the aerosolization of the water contained in the machines. (Id.) Thus, even if Legionella was present in the machines, exposure to the water would not cause Legionnaires' Disease. (Id.) Mr. Frazer testified that "in [his] professional opinion, there's no potential exposure from [Claimant's] job that would have increased his chances of getting Legionella on the job." (Id. at 314a.)

On cross-examination, Mr. Frazer admitted that, while he reviewed the list of locations Claimant visited to service machines, he did not inspect any of the machines Claimant worked on during the two weeks prior to Claimant's injury, and, in fact, did not test any machines at all. (Id. at 315a-16a.) Mr. Frazer further clarified his earlier testimony and stated that while the beverage machines do not provide the *ideal place* for significant Legionella growth, the machines do not produce water that is too cold that Claimant could not contract Legionnaires' Disease if such machines expelled aerosolized water. (Id. at 315a.) Mr. Frazer also stated that if a machine was sent to the shop for repair, the water could potentially cool to a temperature that would foster Legionella growth. (Id. at 316a.) Mr. Frazer also testified that he did not visit Employer's facility until 17 or 18 months after Claimant contracted Legionnaires' Disease. (Id. at 315a.) Finally, Claimant's counsel asked Mr. Frazer if he knew of any notices by the Pennsylvania Department of Health regarding Legionella in the summer of 2013, to which Mr. Frazer responded that he does not follow Department of Health notices because that is a public health issue and public health is not his practice. (Id. at 316a.)

11

The final deposition testimony submitted to the WCJ was from Dr. Snepar, a New Jersey-based physician board certified in infectious disease. (R.R. at 416a-18a.) Dr. Snepar testified as follows. Dr. Snepar reviewed Claimant's medical records going back to June of 2013 and the deposition transcripts of Claimant, Claimant's spouse, Dr. Peck, and the report of Mr. Frazer. (Id. at 420a.) Claimant was admitted to the hospital with a diagnosis of "severe community acquired pneumonia and renal insufficiency." (Id. at 422a.) Claimant later developed "severe respiratory failure with consolidation or involvement of many multiple lobes of his lung requiring mechanical ventilation. He required a tracheotomy for the long-term ventilation and he needed . . . a tube in his stomach for nutrition." (Id. at 422a-23a.) Tests were conducted and, as of July 24, 2013, Claimant suffered from "ventilator dependent respiratory failure, Legionella pneumonia, renal failure, anemia, bipolar disorder[,] and a thrombose in the subclavian and axillary vein." (Id. at 423a.) After being released from the hospital and transferred to in-patient rehabilitation, Claimant

> had several dysfunctions including gait, activity of daily living, cognitive, language and speech and the swallowing, he had an anoxic brain injury,[2] dysphasia, which is trouble swallowing. Right upper extremity deep vein thrombosis. He had critical illness polyneuropathy, history of bipolar disorder [and] Legionella pneumonia. And some of the other issues that he had had at the prior hospital which was Legionella and pneumonia, status post ventilator-dependent respiratory failure.

(Id. at 424a.)

---

[2] Dr. Snepar testified that anoxic brain injury is a brain injury caused by the lack of oxygen. (R.R. at 424a.)

12

Claimant improved at St. Mary's and was released on September 13, 2013, but was readmitted from September 18-24, 2013, for "confusion, slurred speech, and there was a question of a new brain abnormality. . . . And anoxic brain damage[, r]ecent manic episode, abnormal gait, et cetera. But – and it was really malignant hypertension that was the crux of that admission." (Id. at 424a, 426a-27a.)

Dr. Snepar explained the history, causes, and prevalence of Legionnaires' Disease and explained how it is transferred. (Id. at 428-35a.) Based on his reading of the reports and testimony, Dr. Snepar concluded, with a reasonable degree of medical certainty, that Claimant "had a severe community acquired pneumonia due to Legionnaires' Disease. But the source of the organism is not known." (Id. at 439a.) Because Claimant was a smoker, Claimant was a "susceptible host" of the Legionella bacteria. (Id.) He could have been exposed through a "multitude of possibilities," but "there was no increased risk of . . . transmission in his work environment." (Id.) According to Dr. Snepar, "[i]t's not possible to declare the source of [Claimant]'s Legionnaires' Disease with any degree of medical certainty." (Id.)

Dr. Snepar did not agree with Dr. Peck's conclusions. In Dr. Snepar's opinion, Dr. Peck incorrectly presumed that Legionnaries' Disease is an extremely rare condition and that there was no occupation where one is exposed to water vapor as much as servicing beverage machines. (Id. at 436a.) Instead, Dr. Snepar opined that "there [are] many places where one can get Legionnaires' Disease." (Id.) Dr. Snepar searched medical literature and found no cases where Legionnaires' Disease was linked to beverage machines. (Id. at 437a.) Further, Dr. Snepar noted that Dr. Peck was a family physician with no experience in

Legionnaires' Disease and did not cite to any literature to support his conclusions. (Id. at 436a.)

On cross-examination, Dr. Snepar testified that he did not know what Claimant's job entailed, but relied on Mr. Frazer's report to explain how the machines operate and the likelihood of aerosolization. (Id. at 443a.) Dr. Snepar was not aware that Mr. Frazer only spent one hour at Employer's facility more than a year after Claimant's injury. (Id.) Dr. Snepar further stated that he did not know where Claimant picked up Legionnaires' Disease and that he was not provided with any information from Employer on the machines Claimant serviced. (Id. at 445a-46a.) He further opined that even if he tested the water from the machines serviced by Claimant and found the Legionella bacteria, he would not be able to identify where Claimant contracted Legionnaires' Disease because "there may be Legionnaires' Disease all over the place and that doesn't mean that you are going to contract it." (Id. at 447a.)

## II. The WCJ's Decision

The WCJ reviewed all the evidence submitted and made the following credibility determinations and factual findings.

> 22. The testimony of the Claimant has been reviewed and considered in its entirety with the undersigned observing, via the digital video disc, the Claimant's demeanor.
> *The Claimant's testimony is competent, persuasive and accepted as credible in its entirety* supported by his observed demeanor as well as his history of complaints, their onset and nature being consistent with the medical evidence particularly the testimony of Dr. Peck.
> The Claimant's testimony is particularly credible as to his onset of symptoms and their nature as well as to his job activities and exposure to dirty water while doing his job activities particularly during the period from June 10, 2013 through June 27, 2013 while in

14

Pennsylvania and particularly that during his job activities he was sprayed in the face with dirty water from the various machines he serviced or when he was involved with their refurbishment while in the shop.

The Claimant's creditability [sic] is further enhanced by the Pennsylvania Department of Health issuing a Health Alert the highest level of importance warrants immediate action or attention[,] indicating an unusual increase in reports of Legionella infections in some areas of Pennsylvania in June 2013.

In addition, the Claimant's credibility is enhanced by the testimony of the Claimant's spouse, as well as Ms. Eppolito and Ms. Cooper who all worked on the same pool as the Claimant did outside of work and did not contract Legionellosis.

23. The testimony of [Dr.] Peck, . . . [Dr.] Snepar, . . . and [Mr.] Frazer, . . . have been reviewed and considered in their entirety. *The testimonies are found to be competent with the greater weight for persuasion given the testimony of [Dr.] Peck, . . . whose testimony is found to be credible in its entirety.*

When the testimonies of [Dr.] Snepar . . . and [Mr.] Frazer . . . conflict and/or disagree with the testimony of [Dr.] Peck . . . and or the Claimant, they are particularly rejected as not credible.

[Dr.] Peck, . . . as Claimant's treating physician has examined the Claimant over time, reviewed medical records and relied on the credible history of symptoms[,] their nature and onset related by the Claimant. *Dr. Peck is in an overall better position to evaluate the Claimant's condition than the one time review of medical records by [Dr.] Snepar . . .* for the purpose of litigation.

Dr. Peck's opinions are found to be credible and a finding of fact particularly within a reasonable degree of medical certainty, the Claimant's Legionnaires' Disease is a direct result of his occupation and the [a]noxic brain injury is secondary to Legionnaires' Disease, and anoxic brain damage complication, abnormal function of the brain and central nervous system, anxiety, dysfunction with sleep disturbances as well as the Claimant is not able to go back to any form of gainful employment in the future, all related to the work injury.

Dr. Peck's opinions are consistent with the history of the work injury as well as the Claimant's ongoing limitations caused by the work injury and supported by his examinations of the Claimant, review of medical records[,] understanding of the diagnostic testing performed[,] as well as understanding of Claimant's work activities and its environment.

15

Dr. Peck's credibility is further supported by his training and experience as a physician licensed to practice medicine in the Commonwealth of Pennsylvania with an active clinical family practice within which he is board certified.

The credibility of [Mr.] Frazer . . . is undermined as he did not do his evaluation until approximately sixteen months after the Claimant's onset of symptoms, he did not know if any of the machines that the Claimant was working on just prior to his contraction of the disease were preserved for testing. Mr. Frazer indicated he reviewed the logs of the locations where the Claimant was working outside of the Burlington office but did not travel to those locations or look, inspect[,] or review any of the machines the Claimant was working on the week or two prior to contracting Legionella. In addition, Mr. Frazer did not know there was a health warning of an outbreak of Legionella infections in Pennsylvania in June 2013. *The greater weight for belief is given the Claimant's testimony particularly regarding his work activities, its scope and nature as well as his exposure to dirty water into his face while servicing and/or refurbishing the machines.* When Mr. Frazer's testimony conflicts and/or disagrees with the testimony of the Claimant and/or Dr. Peck it is particularly rejected as not credible.

24. The testimonies of Claimant's spouse, as well as De[b]ra Eppolito and Rose Cooper has been reviewed and considered in their entirety and are found to be credible particularly as to their observations and work performed on the Claimant's pool at his residence and that they did not become ill from working on the pool. The Employer has not presented any evidence to refute the witnesses' testimonies.

25. The Claimant on June 27, 2013, was injured while in the course of employment and related thereto, while employed by the Employer (Nestle USA/Vitality). The Employer had timely Notice of the injury. The nature of the injury is an injury to Claimant's lungs, Legionnaires' Disease and [a]noxic brain injury secondary to Legionaries [sic] Disease, and anoxic brain damage complication, abnormal function of the brain and central nervous system, anxiety, dysfunction with sleep disturbances.

26. The Claimant due to the June 27, 2013 work injury became Temporary Totally Disabled June 27, 2013 ongoing.

(WCJ Decision, Findings of Fact (FOF) ¶¶ 22-26 (emphasis added).)

16

Based on these findings and credibility determinations, the WCJ concluded that Claimant met his burden to show that he was injured on June 27, 2013, in the course of his employment and "[t]he nature of the injury is an injury to Claimant's lungs, Legionnaires' Disease and [a]noxic brain injury secondary to Legion[n]a[i]res['] Disease, and anoxic brain damage complication, abnormal function of the brain and central nervous system, anxiety, dysfunction with sleep disturbances." (WCJ Decision, Conclusions of Law (COL) ¶ 2.) The WCJ further concluded that Claimant is entitled to indemnity benefits, minus a credit for short-term disability payments, and medical benefits beginning June 27, 2013. (COL ¶ 4-6.)

Employer appealed to the Board. On appeal, Employer argued: (1) that the WCJ's findings were not supported by substantial and competent evidence to establish a causal connection between Claimant's work and illness, in part because Dr. Peck's testimony regarding causation was equivocal; (2) that the WCJ did not give objective bases for his credibility determinations, i.e., that the WCJ did not issue a reasoned decision; and (3) that the WCJ capriciously disregarded competent evidence of record. (R.R. at 514a-16a.) The Board, finding no error, affirmed. The Board held that "the testimony of Claimant and Dr. Peck, which was accepted as credible, constitutes substantial, competent evidence to support the WCJ's finding that Claimant's Legionnaires['] Disease and resulting complications were causally related to his employment with [Employer]." (Board Op. at 13.) The Board disagreed that Dr. Peck's testimony was equivocal and insufficient because "a review of Dr. Peck's testimony as a whole indicates that Legionnaires['] Disease is a waterborne illness and that in this case, Claimant's exposure to water

17

while working on beverage machines . . . caused him to contract the Disease." (Id. at 13-14.)  Employer now petitions this Court for review.[3]

## III.  Employer's Appeal

On appeal, Employer raises the same arguments raised to the Board.  We shall address each issue in turn.[4]

---

[3] "Our review is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether Board procedures were violated, whether constitutional rights were violated or [whether] an error of law was committed."  Haddon Craftsmen, Inc. v. Workers' Comp. Appeal Bd. (Krouchick), 809 A.2d 434, 438 n.2 (Pa. Cmwlth. 2002).  Substantial evidence is

> relevant evidence that a 'reasonable person might accept as adequate to support a conclusion.'  In reviewing a decision for substantial evidence, the court must view the evidence in the light most favorable to the party who prevailed before the WCJ and draw all reasonable inferences from the evidence in favor of the prevailing party. . . . [I]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made.

Pocono Mountain Sch. Dist. v. Workers' Comp. Appeal Bd. (Easterling), 113 A.3d 909, 918 (Pa. Cmwlth. 2015) (citations omitted).

[4] We understand that the Board's Opinion did not contain separate reasoning on whether the WCJ issued a reasoned decision and whether the WCJ capriciously disregarded evidence of record and that this Court is charged with reviewing Board decisions, not WCJ decisions. Dowhower v. Workers' Comp. Appeal Bd. (Capco Contracting), 934 A.2d 774, 779 (Pa. Cmwlth. 2007).  However, the Board's Opinion contains sufficient discussions on the evidence presented and the findings of the WCJ to justify its decision to affirm the WCJ, and Employer does not raise the Board's failure to address these arguments or otherwise object to this Court considering these arguments herein.  In the interest of judicial economy, we will address Employer's arguments.

18

## A.  Substantial and Competent Evidence

Pursuant to the Act, compensation is provided for only those injuries that arise in the course and scope of employment.  Sections 301(a) and 301(c) of the Act, 77 P.S. §§ 431, 411.  A claimant bears the burden of proving his or her right to compensation, including that the injury was sustained in the course and scope of employment.  Giant Eagle, Inc. v. Workers' Comp. Appeal Bd. (Thomas), 725 A.2d 873, 876 (Pa. Cmwlth. 1999).  Whether the injury was sustained in the course and scope of employment is a legal determination based on the WCJ's findings that are supported by substantial evidence.  Marazas v. Workers' Comp. Appeal Bd. (Vitas Healthcare Corp.), 97 A.3d 854, 861 (Pa. Cmwlth. 2014).  The evidence required to establish a causal connection between the injury and the claimant's employment "is dependent upon whether or not the injury is obviously work-related."  Giant Eagle, 725 A.2d at 876.  If the connection is obvious, no expert medical testimony is required.  Id.  If the causal connection is not obvious, the causal connection must be established by unequivocal medical testimony.  Id.

"Medical testimony is deemed to be unequivocal if, after providing a foundation, the witness testifies that he believes that the fact exists."  Whiteside v. Workmen's Comp. Appeal Bd. (Unisys Corp.), 650 A.2d 1202, 1207 (Pa. Cmwlth. 1994).  The phrase unequivocal medical testimony appears to require some level of certainty.  Yet, it is not the law that "every utterance which escapes the lips of a medical witness on a medical subject, must be certain, positive, and without reservation, exception, or peradventure of a doubt."  Phila. Coll. of Osteopathic Med. v. Workmen's Comp. Appeal Bd. (Lucas), 465 A.2d 132, 134-35 (Pa. Cmwlth. 1983).

> Whether medical testimony is unequivocal is a conclusion of law, fully reviewable by this Court; to make this determination, we must

19

examine the testimony as a whole, recognizing that a final decision should not rest on a few words taken out of context. "[I]t is not absolutely essential that the expert say 'that it is my professional opinion' and it is sufficient for the expert to say 'I think' or 'I believe' as the assertion of his opinion."

Giant Eagle, 725 A.2d at 876 (quoting Phila. Coll. of Osteopathic Med., 465 A.2d at 134). Medical experts testifying to a causal connection between the injury and the claimant's employment "must testify, not that the injury or condition might have or possibly came from the assigned cause, but that in his professional opinion the result in question did come from the assigned cause." Lewis v. Com., 498 A.2d 800, 802 (Pa. 1985). While absolute certainty is not required, testimony which is based upon possibilities is not competent and insufficient to establish a causal connection. Id.

In forming an opinion, a medical expert is entitled to rely on the reports of others so long as those reports are "customarily relie[d] upon in the practice of his profession," and may rely upon facts of which he has no personal knowledge so long as those facts are supported by evidence of record. City of Phila. v. Workers' Comp. Appeal Bd. (Kriebel), 29 A.3d 762, 770 (Pa. 2011). Further, a medical expert may rely on the personal history given to him by the claimant, so long as the claimant's testimony is competent and accepted as true by the factfinder. Somerset Welding & Steel v. Workmen's Comp. Appeal Bd. (Lee), 650 A.2d 114, 118 (Pa. Cmwlth. 1994).

Employer argues that Claimant has not established that his injuries arose in the course and scope of his employment because the medical evidence supporting his claim is equivocal. Employer contends that the evidence shows that the source of Claimant's Legionnaires' Disease is unknown and that Dr. Peck's testimony is less than positive, based on possibilities, and internally inconsistent. Employer

20

further contends that Dr. Peck is not qualified to provide testimony regarding Claimant's Legionnaires' Disease because he has had no specific training on the disease, did not actually start treating Claimant until Claimant was no longer suffering from the disease, and had no objective knowledge of Claimant's work activities.

Employer relies on May Department Stores v. Workmen's Compensation Appeal Board (Smith), 525 A.2d 33 (Pa. Cmwlth. 1987), to argue that Dr. Peck's testimony is equivocal and insufficient to establish causation. There, a deceased claimant's spouse filed a claim petition alleging that her husband contracted Legionnaires' Disease at work and sought compensation under Section 108(n) of the Act.[5] May Dep't Stores, 525 A.2d at 33-34. The decedent's doctor testified that the decedent's Legionnaires' Disease was work-related. Id. at 35. The Referee (now, WCJ) and the Board found the doctor competent and awarded benefits to decedent's spouse. Id. at 33. On appeal, this Court reviewed the doctor's testimony as a whole and concluded that his testimony was equivocal, and

---

[5] Added by Section 1 of the Act of October 17, 1972, P.L. 930, 77 P.S. § 27.1(n). Section 108(n) provides:

> The term "occupational disease," as used in this act, shall mean only the following diseases.
> . . .
> (n) All other diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are causally related to the industry or occupation, and (3) the incidence of which is substantially greater in that industry or occupation than in the general population. For the purposes of this clause, partial loss of hearing in one or both ears due to noise; and the diseases silicosis, anthraco-silicosis and coal workers' pneumoconiosis resulting from employment in and around a coal mine, shall not be considered occupational diseases.

Id.

therefore, not competent. We noted that the doctor, when pressed, "did not volunteer to give details as to the basis for his opinion, and did not elaborate upon his cursory answers." Id. at 35. The doctor testified that his conclusion was based on "the assumption" that "[p]eople that work in damp places, refrigeration, people that work for ducts, . . . they *seem* to have more incidents." Id. (emphasis added). The doctor further testified that he never spoke to the decedent about his job duties and had no knowledge of the decedent's contacts with damp places outside of work. Id.

Upon review of Dr. Peck's testimony as a whole, we conclude that Dr. Peck's opinion expressed in his deposition is unequivocal and competent. While Dr. Peck could not say *at which location* on Claimant's route Claimant contracted Legionnaires' Disease, Dr. Peck never wavered from his opinion that Claimant's "Legion[n]aires[' D]isease is a direct result of his occupation." (R.R. at 279a.) On cross examination, Dr. Peck acknowledged that he could not say with 100 percent certainty that Claimant did not contract the disease outside of work, as nothing is 100 percent certain. (Id. at 288a.) Yet, Dr. Peck maintained that "based on medical information and the history of how Legion[n]aires[' D]isease is contracted[,]" it is "*most likely*" that Claimant contracted the disease from Claimant's intimate contact from beverage machines and that his opinion was stated "within a reasonable degree of medical certainty." (Id. (emphasis added).) This Court has long held that "[m]edical testimony need not be given with unqualified certainty. So long as the witness does not recant his initial opinion, his testimony, if accepted by the fact finder, is competent evidence to support an award of benefits." Brooks Drug, Inc. v. Workmen's Comp. Appeal Bd. (Patrick), 636 A.2d 246, 249 (Pa. Cmwlth. 1993). Unlike the doctor in May Department

22

Stores, whose testimony lacked foundation because the doctor never spoke to the claimant about his work, Dr. Peck's opinion was grounded in his discussion with Claimant on Claimant's job duties and Dr. Peck's understanding that Claimant was, from time to time, sprayed in the face by dirty water. (R.R. at 279a.) The facts relied upon by Dr. Peck in forming his opinions were credited by the WCJ as true. (FOF ¶¶ 23-24); see Somerset Welding & Steel, 650 A.2d at 118 ("medical causation testimony is not rendered equivocal because it is based on the medical expert's assumption of the truthfulness of the information provided; however, the supposed facts forming the basis of that determination must be proven by competent evidence and accepted as true by the [WCJ]."). Also unlike the doctor in May Department Stores, who opined that people who work in the claimant's line of work *seem* to have more incidents of Legionnaires' Disease, Dr. Peck testified that Claimant's job "is precisely the type of job where one would get Legion[n]aires[' D]isease." (R.R. at 280a.)

Employer contends that Dr. Peck's lack of specific training in Legionnaires' Disease, and the fact that Dr. Peck started treating Claimant after Claimant recovered from the disease, makes him not qualified to provide expert testimony. Although it is true that Dr. Peck does not have the specific training or experience as Dr. Snepar, it is well settled that "a physician is competent to testify as to specialized areas of medicine even though he or she is not a specialist or certified in those areas." Sch. Dist. of Phila. v. Worker's Comp. Appeal Bd. (Hilton), 84 A.3d 372, 375 (Pa. Cmwlth. 2014), aff'd, 117 A.3d 232 (Pa. 2015). It is also well established that a WCJ may give greater credence to a treating physician than to one who offers an opinion for litigation purposes. Id. Such questions go to evidentiary weight, not competency, which is not in this Court's purview. It is the

WCJ, not this Court, that is "the exclusive arbiter of credibility and evidentiary weight." LTV Steel Co., Inc. v. Workers' Comp. Appeal Bd. (Mozena), 754 A.2d 666, 676 (Pa. 2000).

Employer also argues that record evidence shows that the cause of Claimant's Legionnaires' Disease is unknown. Employer notes that Dr. Snepar opined that "[i]t's not possible to declare the source of [Claimant]'s Legionnaires' Disease with any degree of medical certainty[,]" (R.R. at 439a), and Mr. Frazer opined that it was unlikely that the machines Claimant serviced aerosolized water, (Id. at 313a). Employer is correct that the record contains conflicting testimony. However, this is of no moment as the WCJ credited Dr. Peck's contrary testimony. "We are bound by the WCJ's credibility determinations." Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.), 873 A.2d 25, 29 (Pa. Cmwlth. 2005). If we find that the record contains evidence a reasonable person might find sufficient to support the findings, "the findings must be upheld, even though the record may contain conflicting evidence." Id. Dr. Peck's testimony represents substantial evidence and we will not disturb the WCJ's findings in this regard.

## B.    Reasoned Decision

Employer next argues that the WCJ failed to issue a reasoned decision within the meaning of Section 422(a) of the Act. A WCJ's decision is reasoned when it "allows for adequate review by the [Board] without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards." Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.), 828 A.2d 1043, 1052 (Pa. 2003). "[I]n rendering a reasoned decision in a case with

24

conflicting evidence, the WCJ 'must adequately explain the reasons for rejecting or discrediting competent evidence.'" Id. (quoting 77 P.S. § 834).

According to Employer, the WCJ "failed to articulate an objective basis for his determination that the testimony of Dr. Peck was more credible and persuasive than the testimonies of Dr. Snepar and Mr. Frazer[,] and failed to adequately explain the reasons for rejecting" Dr. Snepar and Mr. Frazer's testimonies. (Employer's Br. at 38.) We disagree. The WCJ's opinion states that Dr. Peck's testimony was credited over the others because, as Claimant's treating physician, he was "in an overall better position to evaluate the Claimant's condition than the one time review of medical records by [Dr. Snepar]." (FOF ¶ 23.) The WCJ also found Dr. Peck's opinions were consistent with the Claimant's history and Claimant's ongoing physical limitations, as well as supported by Claimant's medical records. (Id.) The WCJ's opinion further states that Mr. Frazer's credibility is undermined by the fact that he did not evaluate Employer's facilities until sixteen months after Claimant contracted Legionnaires' Disease, and that Mr. Frazer never traveled to any of the locations at which Claimant serviced the machines or tested any machines on which Claimant worked. (Id.) The WCJ credited Claimant's testimony regarding his work activities over the opinions of Mr. Frazer based on the WCJ's observations of Claimant's demeanor in the video deposition as well as the fact that Claimant's testimony is consistent with the documentary evidence in the case. (Id. ¶ 22.) These explanations more than satisfy the reasoned decision requirements of Section 422(a) of the Act.

25

### C. Capricious Disregard

Finally, Employer argues that the WCJ capriciously disregarded the evidence of record. Employer contends that the WCJ "deliberately ignored" evidence showing, *inter alia*, that Legionnaires' Disease is not extremely rare and can be contracted in many different places; that the machines Claimant repaired do not aerosolize water; that Claimant was not aware of anyone else at work that contracted the disease; that Dr. Peck likely never treated anyone with Legionnaires' Disease and Claimant was no longer suffering from the disease when he began treating with Dr. Peck; that the Pennsylvania Department of Health alert shows that Claimant could have been exposed through multiple other sources; and that Claimant was treated for pneumonia one month before contracting the disease and, as a smoker, his risks of contracting the disease are increased. (Employer's Br. at 44-46.)

In defining the capricious disregard standard, we have explained:

> Capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence. A capricious disregard of the evidence in a workers' compensation case is a deliberate and baseless disregard of apparently trustworthy evidence. We emphasize our Supreme Court's pronouncement that, where there is substantial evidence to support an agency's factual findings, and those findings in turn support the conclusions, it should remain a rare instance in which an appellate court would disturb an adjudication based upon the capricious disregard of material, competent evidence.

Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works), 862 A.2d 137, 144 (Pa. Cmwlth. 2004) (citations omitted). The express consideration and rejection of evidence based upon an adverse credibility determination is not a capricious disregard of the evidence, it is a rejection of the evidence. Id. at 145.

26

Upon review, we conclude that the WCJ did not capriciously disregard relevant evidence as the WCJ considered the entirety of the evidence alleged by Employer to be capriciously disregarded. The WCJ detailed the evidence at length and either drew a conclusion from such evidence that differed from the conclusion advocated by Employer, or rejected the evidence based upon an adverse credibility determination.

The majority of the evidence Employer contends was disregarded derives from Dr. Snepar's testimony. As the WCJ summarized Dr. Snepar's testimony at length in three pages of findings, and explained why he rejected Dr. Snepar's testimony in favor of Dr. Peck's testimony, it cannot be said that he deliberately ignored the evidence. See id. ("an express consideration and rejection, by definition, is not capricious disregard"). Similarly, Mr. Frazer's testimony was extensively summarized in the WCJ opinion and the WCJ explained his reasons why he found Claimant's testimony on his work duties more credible than Mr. Frazer's testimony. With regard to Mr. Frazer's testimony that the machines Claimant repaired do not aerosolize water, other evidence of record shows that while aerosolized water is the most common way Legionnaires' Disease is spread, it is not the exclusive manner, (FOF ¶ 20*l*), and that Mr. Frazer did not observe any malfunctioning machines like the ones Claimant was tasked to repair. (R.R. at 316a.) We further conclude that the WCJ did not ignore the Department of Health's alert, but rather considered the alert, and viewed it as supporting his finding that Claimant contracted Legionnaires' Disease at work rather than to find, as Employer argues, that Claimant could have contracted Legionnaires' Disease in a host of places. (FOF ¶ 22.) In sum, the WCJ's Decision, specifically its lengthy summaries of the testimonies and exhibits, and its discussion of credibility

determinations, shows that the WCJ did not capriciously disregard relevant evidence of record.

For the foregoing reasons, the Order of the Board is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

28

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Nestle USA, Inc./Vitality,          :
                    Petitioners     :
                                    :
            v.                      :   No. 890 C.D. 2016
                                    :
Workers' Compensation Appeal        :
Board (Gallen),                     :
                    Respondent      :

# O R D E R

**NOW**, March 27, 2017, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge