# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Michael McCormick,                      :
                        Petitioner       :
                                         :
            v.                           :    No. 1162 C.D. 2018
                                         :    Submitted: January 11, 2019
Workers' Compensation Appeal             :
Board (Stuart Dean Company, Inc.),       :
                        Respondent       :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ROBERT SIMPSON, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                        **FILED: June 21, 2019**

Michael McCormick (Claimant) petitions for review of the Order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ) to deny his Claim Petitions. The WCJ denied the Claim Petitions on the basis that Claimant did not establish that he suffered a disabling work-related injury. Claimant argues the WCJ erred in denying his Claim Petitions because the evidence shows he was injured in the course and scope of his employment, and he is entitled to a presumption that the injury is work-related because the injuries occurred while he was driving a company vehicle. For an injury to be compensable, a claimant must demonstrate that the injury arose in the course of employment **and was related thereto.** *O'Rourke v. Workers' Comp. Appeal Bd.*

*(Gartland)*, 125 A.3d 1184, 1189 (Pa. 2015). Based on the credited evidence, Claimant has not established the second requirement, that his injury was related to his employment. Accordingly, we affirm the Board's Order.

## I.    BACKGROUND[1]

On October 9, 2015, Claimant filed a Claim Petition alleging he suffered an injury to his "low back" after being "involved in a work[-]related motor vehicle accident" that occurred "[w]hile he was driving his van from a job site back to" Stuart Dean Company, Inc. (Employer) on April 11, 2015. (Reproduced Record (R.R.) at 6a.) Employer filed an Answer denying an accident occurred, claiming instead that "Claimant pulled his van over to the side of the road, passed out and had a seizure."[2] (*Id.* at 15a.) Employer also denied Claimant suffered the alleged work injury.

On February 25, 2016, Claimant filed a second Claim Petition. Therein, Claimant asserted he suffered "[s]tress[-]related Grand Mal Seizure, injury to middle back, several herniated lumbar discs, low back injury with bilateral lower extremity radiculopathy, numbness to both feet, [and] weakness [in] both hands." (*Id.* at 19a.) In describing how the injury occurred, Claimant stated:

> I was working extra hard on the evening of April 10, 2015[,] to April 11, 2015. Two days['] work in one day with no lunch and no breaks. As a result, I passed out returning my truck to the shop. My van impacted the walls of the highway causing me to suffer physical injuries.

---

[1] Claimant does not challenge the WCJ's findings of fact, upon which our recitation of the facts is based.

[2] Employer previously issued a Notice of Workers' Compensation Denial, refusing to pay benefits because Claimant "did not suffer a work-related injury." (R.R. at 272a.)

2

(*Id.*) Claimant sought full disability benefits from April 11, 2015 forward. Employer filed an Answer, admitting Claimant was involved in a "very minor incident" with the work van, which was otherwise "drivable," but denying Claimant suffered any of the alleged work-related injuries. (*Id.* at 27a-28a.) Employer further asserted: "Claimant had been laid off since December, 2014 until the week of April 6, 2015. Claimant called out during this week[] because of intestinal problems and returned to work on April 10, 2015[,] wearing sweatpants because of his stomach/intestinal issues." (*Id.* at 28a.)

### A.    Claimant's evidence

#### 1.    Testimony of Claimant

The WCJ held multiple hearings on the consolidated Claim Petitions, at which live and deposition testimony was presented. Claimant first testified by deposition as follows.[3] Claimant polished and refinished marble floors for Employer since 2001. He was laid off from Employer from December 2014 through April 6, 2015. Because Claimant's personal vehicle was not operational, Employer permitted Claimant to drive a work van for the week and return it after work on Friday. Claimant had called off sick on Thursday, April 9, 2015, because of stomach issues. On Friday, April 10, 2015, Claimant went to work at approximately 5-5:30 p.m., polished the floors, and left around midnight. While driving on Route 676/Vine Street Expressway, Claimant began feeling lightheaded and sick, so he started to pull over. He next remembers waking up with an ambulance on scene. He has no knowledge of what damage the work van sustained and described the evening as

---

[3] Claimant's deposition testimony is summarized in Finding of Fact No. 2.

"mostly a blur." (WCJ Decision, Finding of Fact (FOF) ¶ 2.d.) Claimant has had severe mid and low back pain since the time of the incident.

At home the next day, Claimant suffered a second seizure, and the ambulance was called to transport him to the hospital, where he was admitted. He complained of back pain at the time. He does not recall telling doctors that he did not notice the back pain until after his second seizure at home. While in the hospital, Claimant spoke with Employer's General Manager by telephone and told the General Manager he did not believe the work van was badly damaged. Claimant spoke to his nephew, who was following in a car behind Claimant at the time of the incident, and based on this discussion believed the work van "grazed" the wall along the side of the road. (*Id.* ¶ 2.f.)

In short-term disability forms submitted after his discharge, Claimant indicated he was out of work due to seizures not related to his work. Initially, Claimant did not list back pain on the form, but in a subsequently submitted form added back pain. When asked why the initial form did not include back pain, Claimant responded that he did not know. Claimant also complained of problems with his hands after being discharged but did not mention his hands in the short-term disability forms. Nor has Claimant received physical therapy for his hands.

Claimant originally treated with his family physician, who referred him to an orthopedist and a neurologist. Because he was dissatisfied with his doctors and because one was "basically releasing" him, Claimant started seeing another physician. (*Id.* ¶ 2.i.) Claimant still experienced back pain, which he rated as a 9 or 10 on a scale of 1 to 10. He could sit, stand, and walk but only for limited periods of time. He had trouble showering and getting dressed. His wife drove him to appointments. He was currently taking Oxycodone, a muscle relaxer, and other

4

medication for depression and anxiety, which he had been prescribed for years. Claimant did not feel that he was physically capable of returning to work.

Claimant's deposition was taken before the filing of his second Claim Petition, so Claimant also testified live before the WCJ after its filing. At the hearing, Claimant testified as follows. He confirmed he was laid off from Employer from December 2014 to April 6, 2015. Claimant admitted to drinking alcohol during his layoff, but denied being "a heavy drinker." (*Id.* ¶ 3.n.) He stopped drinking upon recall but might have drunk a couple of beers when he first returned to work. Prior to his layoff, he normally worked 40 hours per week in the night or overnight. Upon his return from layoff, his schedule was approximately the same. On April 10, 2015, Claimant began work at 4:15 p.m. He had called off work the day before because he got sick from food he ate. Because he did not work the day before, Claimant had two days of work to complete in one day on April 10, 2015. Therefore, he did not take any work breaks that day. Claimant worked on April 11, 2015, from 4:15 p.m. to midnight, at which time he loaded the work van and began driving back to Employer's shop. En route, Claimant "began to feel disoriented and really uncomfortable[,] like he was going to blackout." (*Id.* ¶ 3.d.) He did not recall the actual seizure. Prior to April 11, 2015, Claimant never suffered a seizure, and after his hospital stay, he did not suffer any more. He was not prescribed any medication or treatment for a seizure disorder.

Claimant experiences pain in his mid and lower back, which he attributes to the first seizure on April 11, 2015. He denied prior problems with his back except for maybe one day of work he missed due to back pain. Claimant also complains of the feeling of pins and needles in his legs and problems with his hands. He has not returned to work and does not believe he could return to work because of his

5

condition. He cannot bend over to the ground, sit or stand too long, get down on his knees, or lift and carry items because he has no strength in his hands. Although he has his license, he does not drive because of the pain medication.

2.    *Testimony of Larry A. Wolk, M.D.*

Claimant introduced the deposition testimony of Larry A. Wolk, M.D., one of his treating physicians. Dr. Wolk testified as follows.[4] Dr. Wolk is an emergency room physician and family practitioner. He has not performed surgery since 1993 and relies on a radiologist's reading of MRI scans. Dr. Wolk reads plain x-ray films himself. He first examined Claimant on March 2, 2016, at which time he obtained a history from Claimant. Claimant complained of constant pain in his mid and lower back and problems closing his hands or picking up items. Claimant told Dr. Wolk he drank one to two beers, once to twice a week. Dr. Wolk's physical examination revealed no acute distress and bilateral weakness of hand grasping. "Straight leg raise testing was positive bilaterally," and Claimant had limited range of motion of the cervical and lumbosacral spines. (FOF ¶ 4.c.) Dr. Wolk's initial diagnosis was "epilepsy unspecified and unspecified thoracic, thoracolumbar and lumbosacral intervertebral disc disorder." (*Id.*) Claimant already had physical therapy in place. Dr. Wolk prescribed Oxycodone and saw Claimant again on March 15, 2016, and on a monthly basis thereafter.

Based upon MRI results, Dr. Wolk diagnosed Claimant with "a wedge compression fracture at T-8 and L-1 and intervertebral disc disorder at L3 through L5 and S1, causalgia of the bilateral upper limbs and epilepsy." (*Id.* ¶ 4.e.) The MRI results, according to Dr. Wolk, were consistent with Claimant's clinical

---

[4] Dr. Wolk's testimony is summarized in Finding of Fact No. 4.

presentation. EMG testing also revealed "bilateral L4 and L5 radiculopathy, which correlated with the MRI studies." (*Id.*)

Dr. Wolk attributed the back pain and fractures to the April 11, 2015 incident, disagreeing with Employer's expert, who claimed the fractures were old. Dr. Wolk testified "[Y]ou have to assume injuries unless you get a film demonstrating that it's an old injury." (*Id.* ¶ 4.i.) Dr. Wolk also attributed Claimant's late night work activity as precipitating Claimant's seizure. He further opined it was possible that returning to night work after a four-month layoff or Claimant's intestinal virus the day before may have triggered the seizure. Dr. Wolk did not believe Claimant could return to his pre-injury position.

During cross-examination, Dr. Wolk acknowledged that he did not review records from Claimant's emergency room visit on April 11, 2015, the day of the incident, records from Claimant's family physician, or a sleep study until the day of the deposition and did not review the records from Claimant's subsequent hospital stay at all. He also was unaware of the hours Claimant worked that week and that Claimant called off sick one day earlier. Dr. Wolk assumed Claimant performed the same job duties every day and that Claimant was returning home between 3 a.m. and 6 a.m. at the time of the incident. Dr. Wolk was not certain of the nature of the incident, and instead thought it was more important to know the nature of the injuries than how the incident occurred.

### 3. *Testimony of Norman B. Stempler, D.O.*

Claimant also introduced the deposition testimony of Norman B. Stempler, D.O., who is board certified in orthopedic surgery. Dr. Stempler testified as follows.[5]

---

[5] Dr. Stempler's testimony is summarized in Finding of Fact No. 5.

7

Dr. Stempler first saw Claimant on March 14, 2016, upon referral by Claimant's counsel. Claimant provided a history to Dr. Stempler, including that he had ongoing chronic low back pain since he had a seizure and was involved in a motor vehicle accident on April 11, 2015. Dr. Stempler reviewed available medical records including an MRI of Claimant's brain and lumbar spine. He also conducted a physical examination, which showed Claimant "had a flattened lumbar lordosis consistent with spasm which increased the pain with flexion, extension, side bending and rotation to any degree. Sciatic tension test in two positions increased the back pain also into [Claimant's] sacroiliac joints." (FOF ¶ 5.e.) Dr. Stempler's "working impression" of Claimant "was chronic low back pain, lumbosacral compression fractures of L1-T8 and aggravation of pre[]existing degenerative disc disease of the lumbar spine." (*Id.* ¶ 5.f.) He recommended conservative treatment, namely physical therapy, chiropractic treatment and adjustments, and medication as needed. Dr. Stempler saw Claimant multiple times between his first visit and September 2016. Because Claimant was not doing well with conservative treatment, Dr. Stempler referred Claimant to pain management. In May 2016, Claimant underwent EMG testing, which Dr. Stempler testified was consistent with bilateral L4 and L5 radiculopathy. Dr. Stempler did not believe Claimant was able to return to his pre-injury job.

On cross-examination, Dr. Stempler did not initially recall Dr. Wolk or that Claimant was treated by him. He also admitted he had not reviewed any of Claimant's hospital records. Dr. Stempler further acknowledged that "Claimant's clinical examinations were not consistent with the EMG results." (*Id.* ¶ 5.m.) The compression fractures revealed by the MRI he thought were attributable to the work

8

van striking the wall. Finally, Claimant's complaints were mostly sciatic, not truly radicular, in nature.

### 4. Testimony of Claimant's Nephew

Claimant's nephew (Nephew), also testified via deposition. Nephew testified as follows.[6] He was following Claimant on the evening of the incident for the purpose of giving Claimant a ride home after he returned the work van. When they first met, Claimant told Nephew he was tired and Employer was "working me crazy." (FOF ¶ 6.d.) As he was following Claimant, Nephew noticed something wrong with Claimant's acceleration. Claimant's vehicle then started veering right. Nephew thought Claimant was pulling onto the shoulder, so he followed. Claimant's vehicle then struck a work zone sign as it rolled to a stop. Nephew got out of his vehicle and ran to the work van, at which time he saw Claimant unconscious and "balled in the center seats" with his knees pushed into the center console. (*Id.*) Blood was on a fire extinguisher, the wall, and seats. Nephew grabbed Claimant's work phone and called 911 and his aunt, Claimant's wife. Claimant regained consciousness as he was being placed on a gurney. Nephew spoke to Employer's General Manager and waited with the work van until it was towed from the scene. Nephew noticed a passenger headlight was damaged and a side-view mirror which had been duct taped before the incident was now folded. He saw no damage to the bumper or front grille.

---

[6] Nephew's testimony is summarized in Finding of Fact No. 6.

5.      *Testimony of Claimant's Wife*

Claimant also presented the deposition testimony of his wife of 16 years (Wife), who testified as follows.[7] Claimant worked varying shifts over the last 13-15 years. The Monday and Tuesday before the incident, Claimant worked beginning at 10 p.m. and returned home at 5:30 a.m. He called out a day because he was sick and slept all day. On the day of the incident, Claimant went to work at 4 p.m. and finished around midnight. She received a call that evening from Nephew who told her about the incident. She arrived at the emergency room around 1 a.m. and Claimant was discharged two hours later. Claimant was "in a lot of pain" but he got comfortable and fell asleep. (FOF ¶ 7.d.) The next day, Claimant appeared "fine" so Wife took her son to a ballgame. Upon her return, Claimant asked to call his boss. Claimant remained in bed, and Wife noticed Claimant suddenly stopped talking, his body went stiff, and he started shaking. Before the ambulance arrived, Claimant started to come out of it. Before the incident on April 11, 2015, Wife had not observed Claimant suffer any seizures. According to Wife, Claimant was a social drinker. He was not an alcoholic and was never treated for alcoholism. She denied telling EMS personnel that Claimant drank 30 beers per week and stopped drinking upon recall to work. Claimant purchases 30-packs of beer, which last a week or two, but Wife does not know how much he drinks because of his shift work. He may drink a six-pack on a Saturday night. He does not drink and drive, nor drink on the job, and had not had a drink for two days before the incident.

---

[7] Wife's testimony is summarized in Finding of Fact No. 7.

## B. Employer's evidence

### 1. Testimony of General Manager

Employer presented the deposition testimony of its General Manager, who testified as follows.[8] Claimant worked for Employer for over 10 years and in 2015, Claimant was a marble refinishing foreman, whose duties included maintaining and restoring stone using buffing equipment. Normally Employer did not provide vehicles to its employees, but because Claimant's personal vehicle was inoperable, Employer permitted Claimant to use a work van. Claimant was laid off for several months before being recalled to work the week of April 6, 2015. Claimant did not request a particular shift. That week, Claimant worked beginning at 9 p.m. on April 6 and 7 and 4:30 p.m. on April 8. Because he was sick, Claimant called off on April 9. He returned to work on April 10. He worked approximately 32 hours that week. On the night of the incident, Wife called General Manager to report Claimant was in an accident. Nephew called General Manager and related what happened, specifically, that the work van rubbed against the wall before coming to a stop. General Manager authorized that the work van be towed from the scene. General Manager was told the work van was fine and no accident occurred because Claimant pulled over to the side of the road. When General Manager retrieved it from the tow company on Monday, he observed a missing passenger side mirror and a small scrape on the passenger side bumper. No other damage was observed.

### 2. Testimony of Lee J. Harris, M.D.

Employer also presented the deposition testimony of Lee J. Harris, M.D., a board certified neurologist with subspecialty board certifications in clinical

---

[8] General Manager's testimony is summarized in Finding of Fact No. 8.

11

neurophysiology and electrodiagnostic medicine. Dr. Harris testified as follows.[9] He examined Claimant on June 27, 2016. Claimant reported to Dr. Harris that, on the night of the incident involving the work van, Claimant pulled over after starting to feel badly and understood the vehicle struck a guardrail. Claimant told Dr. Harris he immediately experienced back pain, although emergency room records from the incident do not reflect this. Claimant reported constant pain in his mid and lower back, which radiated into the front of his thighs, constant numbness in his hands, thighs, and feet, constant neck stiffness, and mild neck pain, which was also inconsistent with hospital records. Upon physical examination, Dr. Harris found "a healthy looking man in no acute distress." (FOF ¶ 9.d.) Further,

> [t]here was no lumbar tenderness or muscle spasm, just subjective tenderness over the midline, at approximately T-10. The Claimant's lumbar range of motion was moderately diminished, but his straight leg raising was negative bilaterally. There was full range of motion and no localized tenderness or spasm of the cervical spine. There was no atrophy or muscle weakness in the upper or lower extremities. The Claimant reported subjective decreased pinprick below the knees bilaterally. There was normal coordination. Ambulation was slow but with a steady gait.

(*Id.*)

Dr. Harris testified a CT scan of Claimant's brain revealed mild cerebral atrophy or "mild shrinkage of the brain." (*Id.* ¶ 9.e.) Dr. Harris has observed this finding in his practice in patients who are aging or abuse alcohol. He noted records from EMS and the hospital to which Claimant went following his second seizure include statements from family about Claimant's heavy drinking and that Claimant received treatment for suspected alcohol withdrawal seizures. Hospital records also

---

[9] Dr. Harris's testimony is summarized in Finding of Fact No. 9.

discussed Claimant's back pain, which was attributed to "musculoskeletal strain related to the seizure or to the accident," which improved by discharge. (*Id.*)

Dr. Harris diagnosed Claimant with alcohol withdrawal seizures, which is consistent with the history and chain of events contained in the EMS and hospital records. Dr. Harris did not believe the hospital reports were based upon the EMS report because the EMS report was not yet available to hospital personnel. He explained he has observed many patients over the years with alcohol withdrawal. When someone drinks large quantities of alcohol regularly, Dr. Harris explained the alcohol remains in the system, and when the person stops or significantly decreases consumption, the alcohol being cleared from the system lowers the seizure threshold. The fact that Claimant has not suffered any seizures since April 2015 is consistent with Dr. Harris's diagnosis. Dr. Harris did not believe Claimant's seizures were related to his employment.

Nor did Dr. Harris believe Claimant's back pain resulted from the incident involving the work van. Dr. Harris viewed photos of the work van showing minimal damage. He also noted that no neck or back pain was reported to the emergency room after the incident. Likewise, numbness in Claimant's hands and feet was not documented until months later. Dr. Harris opined that Claimant's peripheral neuropathy was likely related to Claimant's alcohol use. Dr. Harris testified Claimant was not prevented from returning to work by any work-related conditions.

### 3. Testimony of Stuart Gordon, M.D.

Finally, Employer presented the testimony of Dr. Gordon, a board certified orthopedic surgeon, who testified via deposition, as follows.[10] He examined

---

[10] Dr. Gordon's testimony is summarized in Finding of Fact No. 10.

13

Claimant on April 15, 2016. Claimant reported having a seizure and an accident and complained of "a lot of back problems," along with bilateral hand and foot numbness and radiating pain. (FOF ¶ 10.b.) Claimant moved slowly around the room and groaned and grimaced in pain with every position. Dr. Gordon found no positive neurological findings, localized findings, or sciatica. Nor could Dr. Gordon find spasm in the paraspinal muscles when Claimant did a March test. Dr. Gordon further found "no obvious atrophy of the lower extremities;" "full range of motion of the neck; no nerve compressive findings; and a positive Tinel's test." (*Id.* ¶ 10.c.) Dr. Gordon made no objective findings to support Claimant's subjective complaints.

Dr. Gordon reviewed various diagnostic studies, which also did not correlate with Claimant's objective complaints. He noted an October 2015 MRI showed a Schmorl's node, which is a degenerative cyst, formed along a compression fracture and opined it was present for 20-30 years. The compression fracture was non-traumatic in etiology. Dr. Gordon's review of ambulance records showed no documentation of neck or back injuries, and "films showed chronic degenerative changes." (*Id.* ¶ 10.e.) No findings were consistent with radiculopathy on clinical presentation. In short, Dr. Gordon did not believe any of Claimant's conditions were related to the April 11, 2015 incident. At most, Claimant suffered a cervical lumbar strain as a result of the seizure and accident, but was fully recovered and able to return to work without restrictions. He did not believe the compression fracture had been aggravated.

### C.    WCJ's Decision

Based upon the above evidence, the WCJ found Claimant did not suffer a disabling work injury on April 11, 2015, and denied the Claim Petitions. In making

14

this decision, the WCJ found "Claimant's testimony to be neither credible nor persuasive that he suffered work-related seizures, mid back, lower back or upper or lower extremity injuries as a result of the April 11, 2015 work incident." (FOF ¶ 16.b.) The WCJ found significant that Claimant's testimony and statements to treating physicians were not consistent with his recollection of the incident and Claimant's testimony about his alcohol use was not consistent with EMS or hospital records. The WCJ further noted that Claimant indicated the seizures were not work-related when he applied for short-term disability benefits, did not allege a hand injury in the short-term disability forms, and provided inconsistent information in those forms. Finally, the WCJ noted Claimant discontinued treatment with one of his doctors after the doctor told him he was being released and started treating with Dr. Wolk and Dr. Stempler after he filed his Claim Petitions.

The WCJ found Nephew's testimony credible in part. Specifically, the WCJ credited Nephew's testimony that "Claimant was involved in a minor motor vehicle accident on April 11, 2015, resulting in minimal damage to the work van;" that Claimant lost consciousness; Nephew spoke to General Manager; and the work van was towed. (*Id.* ¶ 16.c.) The WCJ did not credit Nephew's testimony that Claimant stopped and told him he was tired, stating it "strains credulity and appeared to be calculated to support the Claimant's theory of liability, particularly since the Claimant's testimony does not corroborate this representation." (*Id.*)

The WCJ likewise only found Wife's testimony credible in part to the extent she observed the second seizure. The WCJ did not credit her testimony that Claimant was only a social drinker, noting it was not consistent with EMS or hospital records. On the other hand, the WCJ found credible General Manager's testimony.

15

In terms of medical evidence, the WCJ was "not persuaded" by the testimony of either of Claimant's medical witnesses, Dr. Wolk or Dr. Stempler. (*Id.* ¶ 16.f-g.) With regard to Dr. Wolk, the WCJ found "[s]ignificant" that:

> Dr. Wolk is not a neurologist or an orthopedist; Dr. Wolk did not begin treating Claimant until March 2, 2016 subsequent to the filing of the [Claim] Petitions; Dr. Wolk admittedly had not received the . . . [h]ospital records; Dr. Wolk had not reviewed the medical records of Claimant's family physician . . . ; Dr. Wolk did not review the EMS report; Dr. Wolk was unaware of the Claimant's layoff and return to work for only three days prior to his first seizure; Dr. Wolk did not know the Claimant's work hours or his sleep schedule during the week preceding his first seizure; Dr. Wolk discounted the significance of the Claimant's history of alcohol use; Dr. Wolk admittedly did not know the specifics of the work incident, noting his understanding that the Claimant was travelling 50-60 mph at the time of the incident; [and] Dr. Wolk admitted that the first indication of back pain was in the . . . [h]ospital records after the second seizure.

(*Id.* ¶ 16.f.) As for Dr. Stempler, the WCJ did not credit his testimony because:

> Dr. Stempler did not begin treating the Claimant until March 14, 2016 subsequent to the filing of the [Claim] Petitions; Dr. Stempler had admittedly not reviewed the medical records from [either] hospital; the doctor only reviewed [x]-ray reports from Einstein Healthcare network and an EMG report from Eastern Pennsylvania Orthopedics; Dr. Stempler's opinions were based in part on his understanding that the Claimant was treated for back problems at [the first hospital]; Dr. Stempler's opinions were based in part on his understanding that the Claimant hit the wall during the motor vehicle incident; Dr. Stempler admitted that the Claimant's clinical examination findings were not consistent with the EMG results; [and] the doctor admitted that the Claimant denied any true radicular symptoms.

(*Id.* ¶ 16.g.)

The WCJ credited the testimony of Employer's medical witnesses, Dr. Harris and Dr. Gordon. The WCJ found Dr. Harris was "highly qualified" to proffer an

16

opinion since he is a neurologist and chief of neurology at a hospital; he was aware of the inconsistencies between Claimant's version of events and medical records; he reviewed various records; his opinions were supported by his examination; and he adequately explained why he believed the seizures were related to alcohol withdrawal. (*Id.* ¶ 16.h.) The WCJ also found Dr. Gordon was "highly qualified;" adequately explained his interpretation of diagnostic testing; and reviewed various records. (*Id.* ¶ 16.i.)

Because Claimant did not satisfy his burden of proof on the Claim Petitions by proving that his seizures or any of his alleged physical injuries were work-related, the WCJ denied the claims. The WCJ further concluded that even if Claimant had shown his seizures were related to shift work maladaptation syndrome, that would not constitute an injury under the Workers' Compensation Act (WC Act).[11] (WCJ Decision, Conclusion of Law ¶ 3 (citing *Metropolitan Edison Co. v. Workmen's Comp. Appeal Bd. (Werner)*, 718 A.2d 759 (Pa. 1998)).)

### D.    Board's Order

Claimant appealed the WCJ's Decision to the Board, which affirmed. The Board noted the "[c]ourse and scope of employment was not an issue." (Board Opinion (Op.) at 1 n.1.) Instead, "[t]he case hinged on causation." (*Id.*) Based upon the credited evidence, the Board concluded the WCJ did not err in denying the Claim Petitions. The Board stated: "It is undisputed that Claimant had a seizure while driving the company van. However, the WCJ rejected Claimant's evidence that his seizure was related to his work and credited [Employer]'s evidence that it was attributable to non-work-related factors." (*Id.* at 9.) As for Claimant's alleged

---

[11] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1 – 1041.1, 2501-2710.

physical injuries, the Board concluded the WCJ properly denied those claims, as well, based upon the credited evidence. Although Claimant presented testimony that those injuries were the result of the incident, the Board noted that the WCJ rejected that testimony as not credible and chose to credit Employer's medical witnesses instead. (*Id.* at 10.)

## II. PARTIES' ARGUMENTS

On appeal,[12] Claimant argues the WCJ erred in denying the Claim Petitions because the evidence proves Claimant was injured in the course and scope of his employment. Specifically, Claimant alleges the WCJ erred in not acknowledging the presumption that his injuries were work-related because he was injured driving a company vehicle back to the workplace from a job site. Claimant also argues the WCJ did not explain why she rejected Claimant's and Wife's testimony and accepted hearsay statements in the record related to Claimant's alcohol use. Finally, Claimant argues the WCJ erred in not interpreting the WC Act in favor of the injured worker and advancing its humanitarian purpose.

Employer responds that Claimant is arguing about course and scope of employment, which was not at issue. It claims there is no presumption that simply being involved in an accident in a work vehicle results in a work-related injury. Rather, Claimant must still show the alleged injury is, in fact, work-related, which Claimant did not do here. Employer notes that the WCJ did not connect shift work

---

[12] "Our standard of review is limited to a determination of whether there has been a violation of constitutional rights, whether an error of law has been committed, or whether all necessary findings of fact are supported by substantial evidence." *Markle v. Workers' Comp. Appeal Bd. (Bucknell Univ.)*, 785 A.2d 151, 153 n.2 (Pa. Cmwlth. 2001). When reviewing questions of law, our review is plenary. *Land O'Lakes, Inc. v. Workers' Comp. Appeal Bd. (Todd)*, 942 A.2d 933, 936 n.3 (Pa. Cmwlth. 2008).

18

maladaptation syndrome to Claimant's seizures, and did not credit Claimant's evidence that the physical injuries alleged resulted from Claimant's work or the incident involving the work van. Employer further argues the WCJ adequately explained why she did not credit Claimant or his witnesses. In closing, Employer argues the humanitarian purpose is advanced only if the close issue is one of law, not fact. Because the factual issues here are not close, Employer asserts a finding against Claimant does not mean the WC Act's humanitarian objectives are not met.

## III. DISCUSSION

To prevail on a claim petition, a claimant bears "the burden of establishing the right to compensation and all of the elements necessary to support an award." *Rife v. Workers' Comp. Appeal Bd. (Whitetail Ski Co.)*, 812 A.2d 750, 754 (Pa. Cmwlth. 2002). Section 301(c)(1) of the WC Act defined "injury" as "an injury to an employe[e], regardless of his previous physical condition . . . arising in the course of his employment and related thereto . . . ." 77 P.S. § 411. Thus, to be compensable under the WC Act, a claimant must prove (1) that the injury occurred in the course of employment **and; (2) was related thereto.** *Krawchuk v. Phila Elec. Co.*, 439 A.2d 627, 630 (Pa. 1981); *O'Rourke*, 125 A.3d at 1189. Here, Claimant focuses on whether his injuries occurred within the course of his employment, the first prong, arguing that because he was involved in a motor vehicle accident in a company vehicle on his way back to Employer's shop from a job site, that he is presumed to be in the course of his employment. However, as the Board correctly noted, course of employment was not at issue. Rather, the reason the WCJ denied the Claim Petitions was because she did not credit Claimant's evidence that the alleged injuries

19

were related to his work, which is the second prong.[13]  We explained in *Workmen's Compensation Appeal Board v. United States Steel Corporation*, 376 A.2d 271, 274 (Pa. Cmwlth. 1977), that the term "and related thereto" was added to the WC Act in 1972 "for the purpose of requiring in cases of injury or death from natural causes, . . . some proof that the injuries were related to the employment."  A claimant bears "the burden of establishing a causal relationship between a work-related incident and an alleged disability." *Rife*, 812 A.2d at 754.  "Where the causal connection between employment and injury is not obvious, the claimant must present unequivocal medical testimony to establish that connection." *Id.*

Here, Claimant presented medical evidence in support of his contention that his seizures and physical injuries were causally related to his work and the April 11, 2015, incident involving the work van.  However, the WCJ, in her discretion, did not credit that testimony. *Rife*, 812 A.2d at 755 ("The WCJ is the ultimate fact finder and has complete authority for making all credibility determinations.")  The WCJ also did not credit the testimony of either Dr. Wolk or Dr. Stempler and adequately explained her reasons for not doing so.  We cannot disturb those determinations upon appeal. *Id.*  The WCJ, instead, credited Employer's witnesses, who testified that the seizures were not related to Claimant's work, nor were the other physical injuries.  The WCJ found the seizures were the result of alcohol withdrawal and the physical injuries, such as the back pain and numbness in Claimant's extremities, did not manifest until after the second seizure at Claimant's home.  In short, the WCJ did not believe the seizures were stress-induced or that the other alleged injuries were

---

[13] Even if it was determined that Claimant was in the course and scope of his employment, he must still show the alleged injuries were related to his work.

the result of the incident involving the work van.[14]  We may not disturb a WCJ's factual findings so long as they are supported by substantial evidence.[15]  Here, Claimant does not challenge any of the findings on the basis they lack substantial evidence.  Regardless, the WCJ's findings are supported by substantial evidence.

This brings us to Claimant's next argument, which relates to the WCJ's decision to discredit Claimant and Wife.  According to Claimant, the WCJ did not explain her reasons for rejecting this testimony.  Under Section 422(a) of the WC Act, 77 P.S. § 834, a WCJ must issue a reasoned decision.  Section 422(a) provides:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached.  The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section.  When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence.  Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers'

---

[14] It appears Claimant cut his head during the incident, although the WCJ made no specific findings related to this.  Regardless, this was not the subject of any of the Claim Petitions.  Claimant did not seek recovery of medical expenses related to this injury.  Furthermore, there is no evidence that this injury caused Claimant any wage losses.  Rather, as the Board noted in its Opinion, Claimant alleged orthopedic injuries as a result of the April 11, 2015 incident.  (Board Op. at 10.)

[15] Substantial evidence is defined as "relevant evidence that a 'reasonable person might accept as adequate to support a conclusion.'" *Pocono Mountain Sch. Dist. v. Workers' Comp. Appeal Bd. (Easterling)*, 113 A.3d 909, 918 (Pa. Cmwlth. 2015) (quoting *Wieczorkowski v. Workers' Comp. Appeal Bd. (LTV Steel),* 871 A.2d 884, 890 (Pa. Cmwlth. 2005)).  When reviewing a WCJ decision for substantial evidence, we must view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in the prevailing party's favor.  *Id.*  It is important to note that "it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd),* 933 A.2d 1095, 1101 (Pa. Cmwlth. 2007).

compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

77 P.S. § 834.

What constitutes an adequate explanation for rejecting evidence in favor of other evidence depends upon whether the testimony was live versus via deposition. *Lewis v. Workers' Comp. Appeal Bd. (Disposable Prods.)*, 853 A.2d 424, 428 (Pa. Cmwlth. 2004) (citing *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.),* 828 A.2d 1043 (Pa. 2003)). In *Daniels*, the Pennsylvania Supreme Court explained that "where the fact-finder has had the advantage of seeing the witnesses testify and assessing their demeanor, a mere conclusion as to which witness was deemed credible, in the absence of some special circumstance, could be sufficient to render the decision adequately 'reasoned.'" 828 A.2d at 1053. On the other hand, when testimony is provided via deposition, a WCJ must articulate an "objective basis" for the credibility determination. *Id.* The requirement for a reasoned decision, however, does not permit a party to second-guess a WCJ's credibility determinations because "determining the credibility of witnesses remains the quintessential function of the WCJ as the finder of fact." *Reed v. Workers' Comp. Appeal Bd. (Allied Signal, Inc.)*, 114 A.3d 464, 470 (Pa. Cmwlth. 2015).

Here, the WCJ provided detailed explanations for her credibility determinations of all witnesses. The WCJ did not credit Claimant's testimony because:

> Claimant's testimony and representations to the testifying physicians were inconsistent regarding the extent of his recollection of the motor vehicle accident; the Claimant's testimony regarding his alcohol use was inconsistent with the hospital and EMS records; the Claimant applied for short[-]term disability benefits alleging that his seizures were not work-related; the Claimant provided inconsistent information

on his disability forms; the injuries alleged on the Claim Petitions were inconsistent; the Claimant did not allege a hand injury in his disability paperwork and did not receive physical therapy for this alleged condition; the Claimant admittedly discontinued treating with [one doctor] when the doctor decided to release the Claimant from treatment; [and] the Claimant began treating with Drs. Wolk and Stempler after he initiated the workers' compensation litigation.

(FOF ¶ 16.b.) Whether Claimant testified live or by deposition, the WCJ provided objective bases for discrediting Claimant's testimony. *Daniels*, 828 A.2d at 1053.

The WCJ also did not credit Wife's testimony related to Claimant being a social drinker because Wife's testimony was inconsistent with EMS and hospital records, which stated Wife told medical personnel otherwise. (*Id.* ¶ 16.e.) This explanation, too, is sufficient under our precedent. To the extent Claimant argues Wife's statements in the EMS and hospital records are impermissible hearsay, we disagree. First, the statements were made for the purpose of obtaining medical treatment and/or diagnosis, which is an exception to the hearsay rule. Pennsylvania Rule of Evidence 803(4), Pa.R.E. 803(4); *Mithani v. Workers' Comp. Appeal Bd. (Mt. Airy Lodge)*, 730 A.2d 566, 568 (Pa. Cmwlth. 1999). Second, it is well-established that medical experts may express an opinion based upon medical records of others so long as those records are of the kind customarily relied upon. *Mithani*, 730 A.2d at 569. The WCJ did not abuse her discretion in discrediting Wife's testimony related to Claimant's alcohol consumption.

## IV. CONCLUSION

For the foregoing reasons, the Board did not err in affirming the WCJ's denial of the Claim Petitions. Claimant did not satisfy his burden by demonstrating a causal link between his work and the seizures or alleged physical injuries. The WCJ acted within her discretion in discrediting Claimant and his witnesses and crediting

23

Employer's witnesses.  Moreover, the WCJ adequately explained her reasons for doing so.

Accordingly, we affirm the Board's Order.

_____
**RENÉE COHN JUBELIRER,** Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Michael McCormick,            :
          Petitioner       :
                           :
          v.              :    No. 1162 C.D. 2018
                           :
Workers' Compensation Appeal    :
Board (Stuart Dean Company, Inc.),    :
          Respondent     :

## **O R D E R**

**NOW**, June 21, 2019, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED.**

_____
**RENÉE COHN JUBELIRER,** Judge